GRIMES v. LA GLORIA CORP. et al.

No. 12429.

Court of Civil Appeals of Texas.
San Antonio.

Sept. 17, 1952.

Grimes & Owen, Taylor, for appellant.

Barksdale Stevens, Binford Arney, Corpus Christi, Lloyd & Lloyd, Alice, for appellees.

POPE, Justice.

This case concerns the interpretation of an oil and gas unitization agreement as embodied in an oil and gas lease and two subsequent amendments to the lease. After a unit was validly created, did the unit operator under the agreement possess the power to exclude certain lands from the unit? That is the point in this controversy. Appellant, E. M. Grimes, a royalty owner, steadfastly refused to agree to the exclusion of lands from the unit, and has here sued for royalty payments based on the original unit. Appellee La Gloria Corporation asserts the power under the agreement to change and alter the original unit even to the point of excluding certain lands from the original unit. The controlling facts are these:

Appellant, Grimes, is the successor of F. A. Bottenfield who executed an oil and gas lease on May 5, 1938. That lease, known as the Bottenfield lease, contained no provisions for pooling, and was for a primary term of five years "and as long thereafter as oil, gas, sulphur or any other mineral is produced from said land by lessee, or drilling operations are prosecuted, as herein provided."

The lease also included a release or surrender clause that stated: "Lessee may, at any time and from time to time, execute and deliver to lessor, or place of record, a release or releases covering any portion or portions of the above described premises, or any mineral thereunder, and thereby surrender this lease as to such portion or portions, or as to such mineral, and be relieved of all obligations and rentals as to the acreage or mineral, surrendered."

The right to unitize the Bottenfield lands arose on March 23, 1942, when the Bottenfield lease was amended as follows:

"17. (a) Lessee is hereby granted the right, power and option at any time or from time to time while this lease is in force, to pool and combine the lands covered by this lease or any portion or portions thereof as to all or any mineral or stratum thereunder, with other lands, lease or leases or portion or portions thereof or mineral or stratum thereunder so as to create units of such size in surface acres as lessee may desire but containing not more than 45 surface acres; provided, if at any time the size specified for the drilling,

completion or producing of a well at a regular location under the then effective orders or regulations of any governmental authority applicable to the area of the lands covered by this lease, requires a unit larger than 45 surface acres or larger than a unit theretofore created, or of a different shape, then lessee may create a unit, or enlarge or change the shape of an existing unit, to such different size or shape as lessee may desire, but not to a size substantially exceeding the size specified in such orders or regulations for a regular location.

\*        \*        \*        \*        \*        \*

"(c) Any well drilled or operations conducted on that part of a unit created hereunder not included in the land described in this lease, at depths down to and including the stratum or depth unitized if so limited, shall be considered a well drilled or operations conducted under this lease and production from any such well of a unitized mineral or from a unitized stratum shall be considered, except as to the amount of royalty payable thereon, as production under this lease. Any well drilled or operations conducted on that part of lands described in this lease and included in such unit shall have the same effect, except as to the amount of royalty payable on production therefrom of a unitized mineral or from a unitized stratum, as though such unit had not been created. \*  \*  \*

"(f) Nothing herein shall impair the right of lessee to release this lease as to all or any portion of the lands covered hereby except that lessee may not so release this lease as to lands within a unit during any period that a well is drilling on the unit or production of a unitized mineral or from a unitized stratum is being obtained on the unit, unless all leases subject to the pool as to lands within the unit are released as to said lands.

"(g) A unit created hereunder shall remain in force, subject to termination by release of leases as above provided, for so long as any lease subject thereto shall remain in force; provided, whenever the primary term of any lease subject thereto expires and when such lease is no longer continued in force by operations or production or force majeure in accordance with its provisions, then the entire unit shall ipso facto terminate."

Before the Bottenfield lands were included within any unit, minerals were discovered on a nearby tract, which we shall call the Stewart-Jones 40-acre tract. Though minerals were discovered, the record shows that in March of 1943 "same are not being produced for various reasons." It was at this point that a second amendment to the Bottenfield lease was executed that permitted a unit of 700 acres rather than one of only 45 acres, as provided in the earlier amendment. That second amendment to the Bottenfield lease was executed on March 13, 1943, and its significant clause provided:

"Paragraph 17 of said lease first hereinbefore described, as amended, \* \* \* is amended by giving lessee, in addition to the right, power and option to create units as therein provided and to enlarge or change the shape of existing units to such different size or shape as lessee may desire but not to a size substantially exceeding the size specified in the then effective orders or regulations of any governmental authority applicable to the area of the lands covered by said lease, the right, power and option at any time and from time to time while said lease is in force, to pool and combine the lands covered by said lease or any portion or portions thereof as to all or any mineral or stratum thereunder, with other lands, lease or leases or portion or portions thereof or mineral or stratum thereunder so as to create a unit of such size in surface acres as lessee may desire but not containing more than 700 acres, or to enlarge or change the shape of an existing unit to such different size or shape as lessee may desire, but not to a size in excess of 700 acres; provided, however, that any unit created under the provisions of

758

this amendment rather than the original provisions of said paragraph 17 shall include the lands covered by the Stewart-Jones Unit hereinbefore mentioned."

After the execution of the second amendment to the Bottenfield lease, a unit was validly formed on April 12, 1943, and was designated as "Shell's 1943 Unit." It included 682 acres of land and among those lands was the Bottenfield lease in which the plaintiff owns royalty. Also included within the boundaries of the unit was the Stewart-Jones 40-acre tract, where there were at that time known discovered minerals. At the time the unit was created and continuously since then, there has been production of oil or gas in commercial quantities from the lands pooled and unitized by "Shell's 1943 Unit." The general outline of that unit is illustrated by Figure One in the attached exhibit. Appellant claims that unit as the one which fixes his rights under his agreements.

FIGURE ONE

40 acre tract

Bottenfield

Shell's 1943 Unit (682 acres)
Created April 12, 1943

FIGURE TWO

Bottenfield

Stewart-Jones No Two (639.52 acres)
Declared April 30, 1947

FIGURE THREE

40 acre tract

Bottenfield

Unit Declared by
Judgment of District
Court.  (679.32 acres)

On May 15, 1947, more than four years later, the appellee La Gloria Corporation created two new units and destroyed the Shell's 1943 Unit. One of those units was called Stewart-Jones Unit No. 2, and it included the appellant's Bottenfield lands, but the new unit did not include the Stewart-Jones 40-acre tract, where oil and gas originally had been discovered, and which was originally within the same unit as the Bottenfield land. Other large tracts of land were excluded from the new unit. The new unit is illustrated by Figure Two in the attached exhibit.

Appellant, Grimes, takes the position that the Shell 1943 Unit, created on the authority of the original lease and its amendments, is the only unit that measures his rights. He continuously protested the right and power on the part of La Gloria Corporation to exclude lands from the original unit without his consent, which has never been given, unless contained in the lease and its amendments. Other persons gave their proper consent to the change of the unit, and their rights are not here involved, nor are those royalty owners before us on appeal. Appellant, Grimes, does not contend that the Bottenfield lease terminated, and the trial court correctly held that it was in full force and effect. Appellee La Gloria Corporation contends that the 1943 amendment empowered it to exclude lands from a formerly created unit.

■ We conclude that the original Shell's 1943 Unit is the one which fixes the rights of the appellant and La Gloria Corporation. The right to form a unit did not exist under the original Bottenfield lease. That right first arose by the 1942 amendment. That amendment expressly authorized the forming of a unit no larger than 45 acres, and also provided that production anywhere on the unit would be considered as a well drilled or operations on the Bottenfield lease, whether actually located on it or not. The 1942 amendment provided that lands within the unit could be surrendered, but that surrender could not be effected as to lands in the unit during drilling on the unit or while there was production of a unitized mineral, unless all leases in the unit also are surrendered. The amendment then provided that the unit would endure as long as any lease in the unit was in force, unless all lands in the unit were surrendered. Since there was production in the unit, since that fact amounted to production as to all lands in the unit, and since there was no surrender of all the leases, as viewed against the 1942 amendment, the unit once created did not cease to exist unless the 1943 amendment authorized a different unit.

The 1943 amendment added to the former agreement certain changes which we can enumerate as follows: (1) The power to create a unit of 700 acres rather than one of 45 acres only, (2) the power to enlarge or change the shape of an existing unit to such different size or shape as lessee may desire, but not to a size in excess of 700 acres, and (3) a requirement that any unit so created must include the Stewart-Jones Unit (the 40-acre tract where minerals had been discovered). Otherwise the provisions of the 1942 amendment were unchanged.

■ That the unit known as Stewart-Jones No. Two, which was created in 1947, was never authorized, is hardly subject to debate, since the 1943 amendment to the Bottenfield lease expressly required the Bottenfield lease to be included in the unit with the small Stewart-Jones 40-acre unit, where minerals had been discovered. The creation of the new unit excluded the 40-acre tract from the unit in which the Bottenfield lands were situated, and for that evident reason was not a compliance with the agreement. We are not impressed with appellees' argument that oil had also been discovered on the lands with which the Bottenfield were unitized in the new unit, and that appellee considered the new unit a fair one. If parties possess the right to make their own agreements, which they do, neither appellee nor this Court is concerned with whether something else may be just as good an agreement. Appellees' duty is to follow the contract made by the parties, not to re-write one just as good. For this reason the Stewart-Jones Unit No. Two, illustrated by Figure Two, instead of being permitted is expressly prohibited by

the 1943 amendment to the Bottenfield lease. This result was correctly reached by the trial court.

■ Moreover, the powers granted La Gloria by the 1943 amendment are great, but in the direction of permitting an increase in the size of the unit. The power is to "enlarge or change the shape of an existing unit." Those words mean that an existing unit may be added to and enlarged, and changed in shape by such addition and enlargement; but it does not mean that an existing unit may be contracted, lands excluded and a unit destroyed. The choice of the word "enlarge" shows the direction of the permitted change. The avoidance of the word "contract" or "diminish," or like wording, shows that the parties did not contemplate reduction in size, but increasing or enlarging—in this instance, from a 45-acre limit to a 700-acre limit. A change by enlargement is precisely the purpose of the 1943 amendment, if we are to believe the purposes as stated in the recitals of the instrument itself, wherein it stated: "Whereas, Shell Oil Company, Incorporated, is now endeavoring to have various leases which it owns in the vicinity of the Stewart-Jones Unit amended *so as to authorize the inclusion of said leases,* or portions thereof, *in an enlarged unit incorporating also the Stewart-Jones Unit.*" We conclude, therefore, that the 1943 amendment, *by a recited inducement in the instrument itself,* contemplated a unit up to 700 acres of land, including the Stewart-Jones 40-acre tract, where minerals had been discovered, and that the essence of the change was the power to enlarge by inclusion of additional lands rather than to diminish by the exclusion of lands, either then or later. City of Jamestown v. Pennsylvania Gas Co., 2 Cir., 1 F.2d 871, 883; Board of Education of City of Okmulgee v. State Board of Education, 201 Okl. 32, 200 P.2d 394.

This view is fortified by examining other portions of the 1942 amendment which were not changed by the 1943 amendment. The 1942 amendment to the Bottenfield lease contained an express clause as to the duration of a unit. To repeat that provision: "A unit created hereunder shall remain in force, subject to termination by release of leases as above provided, for so long as any lease subject thereto shall remain in force." The Bottenfield lease was a part of the Shell's 1943 Unit, and under the provisions of the amendment just quoted, that unit would remain in force as long as any lease in that unit remained in force. The 40-acre tract was a part of the same Shell's 1943 Unit in fact and by contract. It was a producer, and production on that part of that unit under the 1942 amendment was defined as production as to the Bottenfield lands also. Since there was production, as defined, and since the 40-acre tract was in force, the express contract was that the unit itself remained in force. If we interpret these clauses properly, so long as there was production anywhere on the unit, the only way it could be abolished, as distinguished from a change by enlargement, would be by "termination by release of leases as above provided." And that termination method "as above provided" in express language, in the instance of production on a unit, was by the release "of all leases subject to the pool as to lands within the unit." Since there was and is production, since there has been no release of all the leases in the unit, the unit has not terminated, but endures by the express language of the 1942 amendment. The authority to enlarge or change a unit did not change those provisions treating the duration of a unit once created.

■ The parties expressly agreed upon the unit, what must be done to destroy it, as well as what must be done to enlarge upon it. It is not necessary that we endeavor to improve upon their agreement or decide what would be about right. The Shell's 1943 Unit was created and it has never been destroyed by surrender or changed by the inclusion of other lands. Under the agreement appellees are not granted the power to change the unit, by the exclusion of those lands they desire to eliminate from the unit. Knight v. Chicago Corporation, 144 Tex. 98, 188 S.W.2d 564; Appellant, Grimes, by reason of the unitization of his lands with the other lands in the Shell's 1943 Unit, shares in

the royalties on the production anywhere on the unit in the proportion stated in the agreement. Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43. See Garza v. De Montalvo, 147 Tex. 525, 217 S.W.2d 988, 991; French v. George, Tex.Civ.App., 159 S.W.2d 566.

But the trial court, after holding that the complete agreement forbade a unit that did not include both the Bottenfield lease and the Stewart-Jones 40-acre tract, as was done in the 1947 effort to create the Stewart-Jones No. Two Unit, then undertook to correct the wrong by creating a unit that would join them together again. The court held that La Gloria Corporation had breached its unitization agreement by excluding the Stewart-Jones 40-acre tract from the new unit, but that La Gloria Corporation cured its breach by offering to make the plaintiff whole in equity. To make the appellant whole, the court then created the third and different unit, agreed upon by neither the appellant nor the appellees. The court added the 40-acre tract to the Stewart-Jones No. Two Unit, which we have demonstrated was beyond the power of La Gloria Corporation and also because the Stewart-Jones No. Two Unit improperly excluded other large tracts of lands from the former unit. This court-created unit is illustrated by Figure Three in the attached exhibit.

■ ■ Courts do not substitute their contracts for those of the parties. Marlin Associates v. Trinity Universal Ins. Co., Tex.Civ.App., 226 S.W.2d 190, 194. No agreement of the parties authorized a unit such as that illustrated in Figure Three. Either the Shell 1943 Unit or the Stewart-Jones Unit No. Two is the correct unit. Whichever unit it is, it must be found within the agreement of the parties. There may be other combinations of lands as good or even better from appellant's point of view. We gather from his suit that he wants no more and no less than his contract grants him. We think it unnecessary to speculate upon other arrangements or units of property, whether it be as illustrated by Figure Three, which is the unit recognized by the trial court or a variety of others that may or may not be as good or better than what the parties agreed upon. Appellant and La Gloria Corporation made their own contract and eliminated the necessity for others to make a substitute contract. Shell's 1943 Unit is the only one that complied with the agreement, and it has never been validly changed insofar as the appellant and appellees are concerned. The agreement does not grant to La Gloria Corporation the power to exclude lands from a validly established unit.

That part of the trial court's judgment recognizing a unit different from the Shell's 1943 Unit is reversed and judgment is rendered that such unit is and has been in existence since its creation insofar as appellant and appellees are concerned. Under that unit, appellant is entitled to ½ of 110.26/682 of ⅛ of the unit production from May 1, 1947, together with interest at 6% per annum. The costs are adjudged against the appellees.