**EXPANDO PRODUCTION COMPANY, Appellant,**

v.

**Dan H. MARSHALL et al., Appellees.**

No. 16755.

Court of Civil Appeals of Texas.

Fort Worth.

Sept. 16, 1966.

Rehearing Denied Oct. 28, 1966.

W. M. Thacker, Jr., Jones, Fillmore, Robinson & Lambert, and Harold Jones, Wichita Falls, for appellant.

Jimmy P. Horany and Paul O. Wylie, Archer City, for appellees.

## OPINION

LANGDON, Justice.

This case involves construction of a pooling clause contained in certain oil and gas leases. The pivotal question is whether such pooling clause permitted the enlargement of a producing unit several years after it was initially formed and long after the primary term of such leases had expired. The trial court held that the attempt to enlarge the unit was not authorized by the pooling provision of the leases and declared same to be null and void. Judgment was accordingly entered for the appellees. The pipeline purchaser (a defendant in the trial court) was directed to account to appellees in accordance with their respective interests as set out in the original unit designations. Appellees were also adjudged to be entitled to receive as damages interest at the rate of 6% per annum on the amounts held in suspense by the pipeline purchaser during the time this matter has been in controversy.

We reverse the trial court and judgment is rendered that the amended unit designation filed of record on April 30, 1963, constituted a valid enlargement of the unit and that appellees are entitled to be paid for unit production in accordance with the interests which they own in the enlarged unit.

The controlling facts are undisputed. In 1947, appellees, or their predecessors in title, executed a number of separate oil and gas leases covering various town lots in Holliday, Texas, to H. V. Scholl, as lessee. It appears that Scholl acquired one

of appellees' town lot leases by assignment. Each of the leases contained the following identical pooling provision:

"Should this lease cover land which is so shaped or be in such quantity that any part of it cannot be developed under the laws and regulations of any governmental body with authority, or purported authority, over the same, the lessee or his or its assigns shall have the right as to all or any part of the land herein leased to unitize, pool and combine the leasehold estate and lessors royalty estate with other like estates in the immediate area to create unitized areas to be developed and operated as though such lands and interests were all included within the terms hereof and constitute a single lease. All productions from such unitized area shall be divided and allocated on an acreage basis to all land included in the unit. In the event any such unitized area is created by lessee, it shall within a reasonable time thereafter file with the county clerk of the county in which said land is situated, a written statement designating and describing the land and interests so unitized."

On November 14, 1947, Scholl filed an application with the Railroad Commission for a Rule 37 permit to drill a well referred to herein as the Holliday Townsite Unit Well No. 1, to be located in the Daume Field in Archer County. The application indicated that there were 20 acres surrounding the well and the plat which was attached to the application included all of appellees' town lots as well as a number of additional lots which were not under lease to Scholl, including the 1.92 acres in dispute in this case. The Commission granted the permit and a producing well was drilled and completed. Thereafter, on March 5, 1949, Scholl filed a designation of pool in the Deed Records of Archer County, Texas, unitizing appellees' town lot leases into a unit consisting of a total of 10.104 acres.

At the time the designation of pool was filed, it appears from the record that the Railroad Commission had adopted field rules for the Daume Field which provided for 330/660 spacing, 20 acre proration units and an allocation formula based on 50% per well and 50% acreage.

It further appears that the Railroad Commission was never notified that the acreage assigned to the Holliday Townsite Unit well contained only 10.104 acres rather than 20 acres and the well continued to receive a full allowable as if the well had 20 acres assigned to it until the amended unit designation was filed in April of 1963. By 1963, however, the Daume Field was under waterflood operations and a waterflood allowable had been assigned to the well in lieu of that provided for under the Railroad Commission's proration rules. Thus, during the time the well was subject to proration under the Commission's rules, it received higher allowables than it would otherwise have been entitled to receive had the Commission been aware that only 10.104 acres were assigned to the unit.

During the latter part of 1962 (after waterflood operations had commenced in the Daume Field), Fain and McGaha, predecessors in title to appellant Expando Production Company, acquired the oil and gas leases comprising the 10.104 acre Holliday Townsite Unit. Sometime after appellants acquired the leases, in approximately January of 1963, a well known as the Finnell well was completed in the Town of Holliday from the same producing horizon that the Holliday Townsite Unit well was producing. The initial potential of the Finnell well was in the vicinity of 400 barrels a day and this completion stimulated leasing activity in the Town of Holliday.

On March 29, 1963, Fain and McGaha acquired leases on town lots covering 1.92 acres from appellant C. D. Shamburger Lumber Company, Inc. The town lots comprising the said 1.92 acres were actually located inside the boundaries of the Holliday Townsite Unit but were not included in the designation of pool filed by Scholl. Consequently, the owners of the 1.92 acres had received none of the proceeds of pro-

duction from the Holliday Townsite Unit despite the fact that such acreage had been subject to drainage and had in fact been used for allowable purposes by Scholl when he filed his proration unit plat with the Commission.

The record further shows that the 1.92 acres was entitled to a drilling permit under Railroad Commission Rule 37 and there is testimony to the effect that a well would have been drilled on the acreage if appellants had not succeeded in obtaining a lease from Shamburger. After obtaining the lease covering the town lots comprising the 1.92 acres, Fain and McGaha on April 30, 1963, filed an amended unit designation for the purpose of enlarging the original unit to include the 1.92 acres.

By letter dated August 2, 1963, Fain and McGaha notified the royalty owners that the Holliday Townsite Unit had been enlarged to include the Shamburger town lots which increased the size of the Unit from 10.104 acres to 12.024 acres. The pipeline purchaser prepared a new division order reflecting the revised interests of the royalty owners by reason of the enlargement. The letter and division order constituted the only notification to the appellees of the enlarged unit and they have not consented or in any way ratified or acquiesced to such enlargement.

On March 17, 1964, Fain and McGaha applied to the Railroad Commission for approval of its amended unit designation for the Holliday Townsite Unit and by letter dated March 23, 1964, the Railroad Commission notified them that the Commission records had been revised to show a total of 12.024 acres assigned to the Holliday Townsite Unit. Counsel for the appellees timely filed a protest with the Commission complaining of the change in unit designation.

By including the 1.92 acres into the Holliday Townsite Unit appellees' royalty ownership in the Unit was proportionately reduced which they contend is in violation of the pooling provision contained in their leases.

Appellees also contend and the trial court agreed that the pooling clause contained in the leases granted a limited power to pool as distinguished from a general power which could only be exercised at the time the original unit designation was filed. They say that it was not necessary for the development of any part of the leased premises to enlarge the unit and point out that the inclusion of the 1.92 acres did not result in the drilling of an additional well. Appellees also correctly state that it was not necessary to increase the size of the unit for the well to be operated under the regulations of the Commission. In order to enlarge the unit without their consent, appellees say that such enlargement could only be accomplished as a result of a necessity to comply with governmental regulations.

Appellees also point out the long lapse in time between the formation of the initial unit and the enlargement thereof, calling attention to that part of the pooling provision contained in the leases which requires the lessee to file a written statement with the County Clerk describing the land unitized "within a reasonable time" after the designation of the unit has been determined.

Appellants contend on the other hand that the enlargement of the Holliday Townsite Unit was in accordance with the terms of the pooling clause and that such action was in the best interests of the appellee royalty owners.

To support their position that appellants violated the terms of the pooling provision by the attempted enlargement, appellees rely heavily upon Grimes v. La Gloria Corp., 251 S.W.2d 755 (San Antonio Civ.App., 1952, no writ hist.), together with the recent Supreme Court case of Jones v. Killingsworth, 403 S.W.2d 325 (Texas, 1965). These cases hold that the lessee's power to pool is confined to such authority as is provided by the lease and is not left to the uncontrolled

discretion of the lessee even though he exercises good faith. In the La Gloria case, the Court held that a lessee could not exclude acreage previously committed to a unit without the consent of the lessor or without clear authority to do so under the pooling provision. For the reasons hereinafter stated we do not believe that our holding here is inconsistent with these opinions.

■ We construe the language of the pooling clause in appellees' leases to mean that the lessee is authorized to unitize such acreage as is required to comply with the development and drilling pattern established by the regulatory authority, here the Railroad Commission of Texas. Field Rules for the Daume Field provide for a 20 acre development plan.

In order to develop the leases pursuant to the laws and regulations of the Railroad Commission, the lessee needs to have a total of 20 acres to assign to a well drilled in the Daume Field. The fact that a well may be legally operated on acreage smaller than called for by Railroad Commission regulation is beside the point. The Lessee was given authority to pool up to the amount of acreage provided for by the rules and regulations of the Railroad Commission governing the Daume Field. That was 20 acres.

The fact that one need consult the governing rules and regulations of the Railroad Commission to ascertain the true intention of the parties as to the construction of a pooling provision has found judicial approval by the courts of this State on more than one occasion. In the Killingsworth case, the Supreme Court construed the pooling provision there involved in relation to the applicable rules of the Railroad Commission in the Fairway Field.

■ If the parties who agreed to the language of the pooling provision had not intended to permit the lessee to pool an amount of acreage called for by regulations of the Railroad Commission, as appellees

contend, then the pooling provision is rendered virtually meaningless. It probably would also have prevented the formation of the original unit by Scholl because it was possible even at that time to obtain permits for the drilling of wells on separately owned town lots. We find nothing in this record to establish that Scholl was required to form the original unit *solely* for the purpose of drilling a well. It appears that he might have been required to drill several wells if he had not filed his initial designation of pool.

It is entirely possible that under Commission Rule 37 several of appellees' town lots which were initially unitized by Scholl and included in the original unit might have been entitled to separate drilling permits. But appellees concede that the initial unitization of the town lots was authorized in order to conform to the regulations of the Railroad Commission.

The circumstances under which the amended unit designation was filed by appellants Fain and McGaha were no different from those under which the original unit was created. The original unit contained only 10.104 acres, less than the 20 acre development pattern called for by Railroad Commission regulation. The formation of the original unit, like the later enlargement of the unit, was not done solely for the purpose of obtaining a drilling permit but was done for the purpose of developing the premises under Railroad Commission regulations which contemplated the assignment of 20 acres to each producing well.

■ It seems inescapable to us that the pooling provision was included in the original leases, at least in part, to prevent the separate devolpment of each of the town lots. The parties envisioned development of the leases in accordance with the development pattern established by the governing regulatory authority. Indeed such government regulation has been held to almost compel such a unitization provision. In Phillips Petroleum Company v. Peterson,

218 F.2d 926 (10th Cir., 1954), cert. denied, 349 U.S. 947, 75 S.Ct. 871, 99 L.Ed. 1273, the court declared: "Provisions in oil and gas leases for unitization have become a practical necessity in the oil and gas industry, because of governmental rules and regulations imposing strict requirements for the proper spacing of wells and the granting of production allowables on the basis of formulae predicated in whole or in part on the quantity of acreage from which the oil and gas can be efficiently recovered by one well completed in the reservoir involved."

■ In this case the enlargement certainly appears to be in the best interests of both the appellants and appellees. Appellants contend that appellees will ultimately derive more proceeds from the enlarged unit than would have been the case if the unit had remained in its original size and an additional well had been drilled on the 1.92 acres. There is no doubt that the drilling of a well on the 1.92 acres would not only have been an additional expense to appellants but it would also have reduced the amount of oil that could have been recovered from the Holliday Townsite Unit well. The record shows that the drilling of such well might have reduced recovery from the Holliday Townsite Unit by as much as 50%. Recognizing this, Fain and McGaha obtained a lease on the 1.92 acres and by including the acreage into the Holliday Townsite Unit, they prevented the drilling of the additional well. There is nothing in the pooling clause that prevents the enlargement of a unit so long as such unit does not exceed the development program called for by governmental regulation. We hold that Fain and McGaha were within their contractual rights to enlarge the unit to include the 1.92 acres.

Appellees also urge that the conditions under which the pooling authority could be exercised did not exist at the time that the amended unit designation was filed. The last sentence of the pooling clause provides as follows: "In the event any such unitized area is created by lessee, it shall within a reasonable time thereafter file with the County Clerk statement designating and describing the land and interests so unitized." The amended unit designation was filed a number of years after the designation of the original unit. The primary terms of the leases had long since expired and the leases were being held by production from the Holliday Townsite Unit well.

In Texaco, Inc. v. Lettermann, 343 S.W. 2d 726, 731 (Amarillo Civ.App., 1961, writ ref., n. r. e.), it was contended that the lessee had no authority to exercise the pooling power a second time after the termination of the original unit. The first unit had been dissolved by reason of the drilling of a dry hole and part of the land was included in a subsequently formed unit where a producing well was obtained. Several years lapsed between the termination of the first unit and the designation of the second unit. In upholding the action of the lessee, the court observed: "In determining whether or not lessees' power to pool leases had been exhausted, the courts look to the good faith of the lessee as well as to the lease pooling clause itself. No specific language is found in the pooling clause before us which either permits or prohibits a lessee from exercising these rights a second or subsequent time. No such phrase as 'at any time' or 'from time to time' is found in the pooling clause of the appellees' lease."

In Tiller v. Fields, 301 S.W.2d 185 (Texarkana Civ.App., 1957, no writ history), the court was called upon to construe a pooling provision which read in part as follows: " 'Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with the spacing rules of the Railroad Commission of Texas or other lawful authority,

or when to do so would, in the judgment of Lessee promote the conservation of the oil and gas in and under and that may be produced from said premises.'" It was contended that the above language was too vague to be enforced because it did not define either the time for exercising the pooling authority or the size of the unit to be formed pursuant to such authority. In rejecting this contention, the court declared: "Anticipatory provisions in leases for the commitment by the lessee of such leases to unitization, of necessity must be in general terms. Neither the lessor nor the lessee has any way of knowing at the time the lease is taken the facts with respect to which it will be necessary for the lessee to apply his power. It is not practicable for the lessee to await the ascertainment of such facts. He knows from experience that because of the possibility of many changes in ownership of the lessor's interest as time goes on, it may be difficult to effect an agreement if the right to unitize is not included in the lease itself."

■■ There is no doubt but what there is a fiduciary obligation on the part of the lessee to exercise the utmost good faith toward the lessor in exercising the power granted under a pooling provision. Unitization cases in practically all jurisdictions so hold. Where, like here, the pooling is accomplished after production is obtained and after the primary term has expired (and where there is no clear indication contained in the pooling clause itself with respect to the exact timing of such unitization), we are of the opinion that the good faith exercised by the lessee becomes of paramount importance. Tiller v. Fields, supra. In this case, we are of the opinion that appellants exercised the degree of good faith required of them toward appellees and that there was no violation of the pooling provision because of the lapse in time between the formation of the original unit and the filing of the amended unit designation to enlarge the unit.

Reversed and rendered.