Harry W. ELLIOTT, Jr., et al., Appellants,

v.

S. E. DAVIS et al., Appellees.

No. 8741.

Court of Civil Appeals of Texas, Amarillo.

June 20, 1977.

Rehearing Denied July 18, 1977.

Whitten, Sprain, Price, Wagner & Edwards, Abilene, Vinson, Elkins, Searls, Connally & Smith, Houston, Jennings, Montgomery, Dies & Turner, Frank L. Jennings, Graham, for appellants.

Heatly & Heatly, Paducah, Simon & Simon, Henry W. Simon, Sr. and John W. Hughes, Fort Worth, for appellees.

ROBINSON, Justice.

This is a suit by lessors to cancel mineral leases on the grounds that lessees had exercised pooling provisions in bad faith. The trial court granted the plaintiff's motion for summary judgment declaring that the pooled unit insofar as it pertained to the plaintiffs' leases was cancelled and that the plaintiffs' leases had expired by their own terms. Defendants appeal. Reversed and remanded.

Between April and August of 1969 the plaintiffs executed to defendant Nueve Operating Company oil and gas leases on their land in Cottle County. In addition to the plaintiffs' land, Nueve also leased land owned by the Gilbreaths, the Parnells and K. E. Moss. This Nueve Lease Block covered 1532.66 acres. Defendant Nueve later assigned an overriding royalty to defendant Andrew P. Werner. The leases were assigned to the other defendants subject to the overriding royalty. All except one of the leases were on the same standard "Producers 88" form, which contained a provision that the leases should remain in force for a fixed five year primary term "and so long thereafter as oil, gas or other mineral is produced from said land or with which said land is pooled," and a provision giving the lessee the right to pool or unitize the leases.

Paragraph 6 of the leases, which contains the continuous operation clause, reads in part as follows:

. . . If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land or land pooled therewith but lessee is then engaged in operations for drilling, mining, or reworking of any well or mine thereon, this lease shall remain in force so long as

such operations or said additional operations are commenced and prosecuted (whether on the same or successive wells) with no cessation of more than sixty (60) consecutive days, and, if they result in production, so long thereafter as oil, gas, or other mineral is produced from said land or land pooled therewith. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and draining the leased premises, lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances. The judgment of the lessee, when not fraudulently exercised, in carrying out the purposes of this lease shall be conclusive.

The pooling or unitization clause reads as follows:

Lessee is hereby granted the right to pool or unitize this lease, the land covered by it or any part thereof with any other land, lease, leases, mineral estates or parts thereof for the production of oil, gas or any other minerals. Units pooled for oil hereunder shall not exceed forty (40) acres plus a tolerance of ten per cent (10%) thereof, provided that if any Federal or State law, Executive order, rule or regulation shall prescribe a spacing pattern for the development of the field or allocate a producing allowable on acreage per well, then any such units may embrace as much additional acreage as may be so prescribed or as may be used in such allocation or allowable. Units previously formed may be reformed to exclude acreage or formations in such original units and/or to include additional acreage or formations. The forming or reforming of any unit shall be accomplished by lessee by his executing and filing for record a declaration of unitization or reformation, which declaration shall describe the unit. Such units may be designated either before or after the completion of wells. Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were

upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not. The entire acreage pooled into a unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease. In lieu of the royalties herein provided, lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.

Delay rentals were paid and a well was drilled on the Gilbreath tract in 1969. There was no further development of the leases until just before the end of the primary terms because Imperial-American, which was the owner of 80% of the leasehold interest at that time, was in bankruptcy in Colorado and refused to participate or farm out its lease. In January of 1974, the president of Nueve Operating Company, Harry W. Elliott, Jr., began negotiations with Tom Darling of the Burke Royalty Co., which was interested in drilling a well in that area. Imperial-American agreed to farm out and executed an assignment to Burke.

On February 27, 1974, Nueve applied to the Railroad Commission for permission to drill a wildcat well on the Parnell tract. Along with the drilling application the defendant submitted a plat of 352 acres which was very irregular in shape and which included portions of the land covered by each lease in the 1532.66 acre Nueve Lease Block.

Elliott testified by deposition that he drew the unit to conform to the pooling provision of the leases so as to allow an orderly development of acreage that promised to be productive. He testified that he designed a 352 acre pool in anticipation of Railroad Commission field rules should they get a producing gas well. In his affidavit opposing plaintiffs' motion for summary judgment, Elliott stated as follows:

In my opinion such an orderly development program was in the best interest of both the plaintiffs, as royalty owners, and the defendants, as working interest owners and operator, and this was the most feasible prudent and reasonable manner in which to accomplish the purpose of the leases for the mutual benefit of both the plaintiffs and the defendants. The C. L. Parnell Unit was designated by the defendants in good faith as a part of their plans for the orderly exploration and development of the leases included therein.

On March 27, 1974, the defendants Burke Royalty Co., Joe H. Staley, G. T. Kimbell, V. H. Frazier and M. L. Elliott filed a pooled unit designation in Cottle County, which was identical to the plat submitted to the Railroad Commission.

Shortly before midnight on March 31, 1974, Elliott and Burke had a contractor move a drilling rig onto the Parnell land. A wild cat well was drilled at a cost of approximately $130,000. A gas well was completed on May 7, 1974. There is evidence that the operations continued with reasonable diligence and that any delay was merely operational. Because there is no connecting pipeline to this well as yet, it was capped. The defendants have tendered "shut-in" royalty payments to the plaintiffs who have refused to accept them.

By a letter dated June 3, 1974, the Railroad Commission permitted the regular permit for the Parnell well to remain in effect but found that the acreage shown on the plat submitted with the drilling application would be totally unacceptable as a unit to be assigned to the well.

Elliott testified that the lessors had always intended to reform the unit for an orderly development of the acreage, but that the Railroad Commission would not accept a reformed unit because of the pending suit. Attached to Defendants' First Amended Original Answer and Cross Action and referred to by Elliott in his deposition is a proposed "Reformed Pooled Unit Designation" dated September 23, 1975.

Plaintiff lessees filed this suit seeking a determination that the Pooled Unit Designation was invalid and that the leases expired by their own terms because of the lack of production from or drilling operations on their respective lands during the primary terms. The trial court entered summary judgment for plaintiffs.

■ A summary judgment may properly be granted only when there is no genuine issue of material fact. Rule 166–A, Texas Rules of Civil Procedure. The burden of proof in a summary judgment case is on the movant and all doubts as to the existence of a genuine issue of material fact are resolved against him. All conflicts in the evidence are disregarded, and the evidence which tends to support the position of the party opposing the motion is accepted as true. *Farley v. Prudential Insurance Company*, 480 S.W.2d 176, 178 (Tex.1972); *Great American Reserve Insurance Company v. San Antonio Plumbing Supply Company*, 391 S.W.2d 41 (Tex.1965).

■ The anticipatory pooling power given the lessee in oil and gas leases is necessarily broad. *Tiller v. Fields*, 301 S.W.2d 185 (Tex.Civ.App.—Texarkana 1957, no writ). In the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense. *Texaco, Inc. v. Lettermann*, 343 S.W.2d 726, 732 (Tex.Civ.App.—Amarillo 1961, writ ref'd n. r. e.). There is, however, an implied requirement that the lessee exercise good faith in making the determination to pool. *Banks v. Mecom*, 410 S.W.2d 300 (Tex.Civ. App.—Eastland 1966, writ ref'd n. r. e.); *Tiller v. Fields, supra.* The general rule is that the question of what constitutes good faith in the circumstances of a particular case is one of fact to be resolved by the fact finder. *Kiser v. Lemco Industries, Inc.*, 536 S.W.2d 585 (Tex.Civ.App.—Amarillo 1976, no writ); *Modular Tech. Corp., Etc. v. City of Lubbock*, 529 S.W.2d 273 (Tex.Civ.App.— Amarillo 1975, writ ref'd n. r. e.).

In the case before us, plaintiff lessors contend that they have established by summary judgment evidence that the pooling power was exercised in bad faith as a matter of law and that, therefore, there is no fact issue concerning good faith.

Plaintiff further contends that the requirement that the lessor exercise good faith toward the lessee in pooling is a fiduciary obligation and that defendant should be held to a strict fiduciary standard. It is true that some courts have described the duty of the lessee to the lessor in terms of a "fiduciary obligation on the part of the lessee." See *Expando Production Company v. Marshall*, 407 S.W.2d 254 (Tex.Civ.App.— Fort Worth 1966, writ ref'd n. r. e.) and *McCarter v. Ransom*, 473 S.W.2d 235 (Tex. Civ.App.—Corpus Christi 1971, no writ). However, we find no case in which the courts have treated the obligation as a conventional trust relationship.

The cases in question are analyzed in *Pritchett v. Forest Oil Corp.*, 535 S.W.2d 708 (Tex.Civ.App.—El Paso 1976, writ ref'd n. r. e.). There, the plaintiff who owned an overriding royalty interest which had been voluntarily pooled into the defendant-unit operator's unit, relied on the above cited cases and argued that the unit operator had become a trustee and owed her a fiduciary obligation not to acquire any interest adverse to hers. The El Paso court rejected the plaintiff's arguments and held:

These cases require fairness in the exercise of the pooling power, but none go to the extent of recognizing a conventional trust relationship.

We conclude that the standard of good faith is correctly described in Kuntz, The Law of Oil & Gas, § 48.3, p. 218, as follows:

Although it has been said that the lessee has a fiduciary obligation in the exercise of the pooling power, it is submitted that the lessee is not a fiduciary and that standards applied to fiduciaries are entirely too strict. This is so because the lessee has not undertaken to manage and develop the property for the sole benefit of the lessor. The lessee has substantial interests that must be taken into account, and he should not be required to subordinate his own interests entirely to the interests of the lessor. Since his interests

frequently conflict with those of his lessor, however, he must exercise the power in fairness and in good faith, taking into account the interests of both the lessor and lessee.

We have applied the foregoing standard of good faith to the summary judgment evidence, considering such evidence in the light most favorable to appellant defendants. We conclude that the summary judgment proof, including evidence of the configuration of the unit, the fact that expiration of the primary term of the leases was imminent at the time of the pool designation, and Elliott's testimony that he did not consider a geological basis in the formation of the unit, raises a fact issue for determination of the trier of fact. We do not find that the evidence so conclusively establishes bad faith that reasonable minds could not differ in considering that question.

The refusal by the Railroad Commission to approve the pooled acreage as a unit to be assigned to the well is not, in itself, determinative of the question of good faith. The Railroad Commission is a conservation body and does not have jurisdiction to effect a change of property rights. *Whelan v. Placid Oil Co.*, 274 S.W.2d 125 (Tex.Civ. App.—Texarkana 1954, writ ref'd n. r. e.). Likewise, the mere fact that the unit was declared and drilling begun shortly before the expiration date of some of the leases does not establish bad faith as a matter of law. In *Boone v. Kerr-McGee Oil Industries*, 217 F.2d 63 (10th Cir. 1954), wherein the court found that the pooling designation was for the two-fold purpose of properly developing the premises and to extend the leases beyond their primary term, the court stated:

> The mere fact that only a few months of the primary term remained . . . does not make arbitrary a decision which, based upon a consideration of relevant factors, was proper. Neither does the pooling arrangement, reached upon a consideration of relevant factors, become arbitrary merely because it relieves appellees from ruinous, wasteful drilling oper-

ations which would be necessary if it wanted to retain its leases, even if that was one of the factors it had in mind at the time it reached its decision.

Our holding that there is a jury issue on the question of the failure to exercise good faith in making the pooling designation is determinative of this appeal. We do not reach appellants' remaining points of error.

The judgment of the trial court is reversed and the cause remanded.