**AMOCO PRODUCTION COMPANY, Appellant,**

v.

**The FIRST BAPTIST CHURCH OF PYOTE et al., Appellees.**

No. 6748.

Court of Civil Appeals of Texas, El Paso.

Feb. 14, 1979.

Rehearing Denied April 4, 1979.

Stubbeman, McRae, Sealy, Laughlin & Browder, W. B. Browder, Jr., Richard E. Booth, Midland, for appellant.

Kerr, Fitz-Gerald & Kerr, Harris E. Kerr, Wm. Monroe Kerr, Midland, for appellees.

## OPINION

OSBORN, Justice.

This case involves the issue of an implied covenant to market natural gas at fair market value under a lease which provides for a royalty based upon the amount realized from the sale of such gas. The trial Court awarded recovery for a sum based upon the price paid by other purchasers of gas from the same well. We affirm that part of the judgment, but reverse and render as to the part which requires that future royalties be based upon the price paid in the future by one specific purchaser of gas from the well in question.

## FACTS

The dispute between these parties concerns eighteen leases covering small tracts of land in the Townsite of Pyote, in Section 100, Block F, G & MMB & A Survey, Ward County, Texas. The Appellant owns oil and gas leases covering these tracts, each of which provides that on gas sold at the wells, the royalty shall be ⅛th of the amount realized from such sale. There is no dispute in this case concerning the fact that the gas is sold at the well.

The several owners of the oil and gas leasehold estates in tracts of land in Section 100 pooled the same to form the Caprito 100 Unit, containing 640 acres of land. The Appellant's leases, as pooled, cover 17.14240 percent of the unit. In 1973, the working interest owners drilled a well on this Section, and it was completed as a dual producer from both the Devonian and Ellenberger Formations. The working interest owners have been selling gas to one of four different purchasers, each of whom has its own gas pipeline connected to the well. Under the various gas purchase agreements with the different working interest owners, the total production from the well is sold approximately fifty-three percent to Lone Star Gas Company, twenty percent to Pioneer Natural Gas Company, fourteen percent to Delhi Gas Pipeline Corporation, and thirteen percent to Natural Gas Pipeline Company. All gas production attributable to the various interests of the Appellees has been sold to Pioneer Natural Gas Company and Odessa Natural Gasoline Company, who has acquired its rights under Pioneer.

Natural Gas Pipeline Company transports its gas interstate and the price paid under its contracts are subject to Federal Power Commission regulations, including price regulations. Both Lone Star and Delhi have contracts with their working interest owners which provide for an annual price redetermination provision to reflect current prices of gas each year. The prices they paid from initial production up to the time of trial were as follows:

| Lone Star | | Delhi | |
|---|---|---|---|
| Price Per MCF | | Price Per MCF | |
| .625 | Dec. 73 to July 74 | .80 | Oct. 73 to Oct. 74 |
| 1.30 | July 74 to July 75 | 1.30 | Oct. 74 to Oct. 75 |
| 1.90 | July 75 to July 76 | 1.90 | Oct. 75 to Oct. 76 |
| 1.95 | July 76 thru June 77 | 1.95 | Oct. 76 thru June 77 |

By reason of production from other wells in neighboring sections, Amoco and Pioneer entered into a gas purchase contract in November, 1969 covering leases then owned by Amoco in nineteen sections of land in Ward County. This twenty-year gas purchase contract provided a price of 17¢ per MCF through December 31, 1974, and basically a 1¢ acceleration every five years of the contract. It also provided for the release of the dedication of acreage not assigned to a producing well as of December 31, 1974. There was no requirement for additional or subsequent dedication to the contract of other leases. In October, 1970, Amoco and Pioneer amended the 1969 gas contract and

substituted a new list covering Defendant's leases in twelve sections of land, including six of the eighteen leases involved in this case. As of June 1, 1975, Amoco entered into a supplemental agreement with Pioneer and Odessa by which Amoco dedicated additional leases to the 1969 contract, including the other twelve leases involved in this litigation. In return for the dedication of these additional leases, Pioneer and Odessa agreed that the gas from the Caprito 100 Unit would be increased to 70¢ per MCF retroactive to August 1, 1974, and that beginning on August 1, 1975 and each year thereafter, there would be a 1¢ per MCF acceleration.[1] Thus, by way of comparison, the Appellees were paid 17¢ per MCF for gas produced prior to August, 1974, 70¢ per MCF for the next twelve months, 71¢ per MCF for the next twelve months, and 72¢ per MCF for the remaining months through June, 1977.

## FINDINGS AND CONCLUSIONS

The trial Court filed extensive findings of fact and conclusions of law, and determined that Amoco breached no duty with respect to the payment of royalty under the six leases where the gas was dedicated to the Pioneer contract under the 1970 amendment. There is no complaint about that part of the trial Court's decision. The trial Court further held that Amoco breached its legal duty with respect to the lessors under the twelve leases where gas was dedicated to the Pioneer contract by the 1975 supplement, and further that those parties were entitled to be paid the difference between the amounts which they were paid and the amounts which Lone Star was paying for gas purchased from this well during corresponding periods. In addition, the trial Court ordered that future payments shall be based upon the price paid by Lone Star Gas Company for gas produced from this particular well.

The Appellant presents twenty-three points of error. Basically, the attack is upon four different findings made by the

trial Court, and the decision in the case necessarily turns upon those particular findings which are as follows:

"19.

"The market prices of gas produced each month from the Section 100 Well are equal in amount to the prices paid each month by Lone Star Gas Company to the working interest owners in the Section 100 Unit from which Lone Star Gas Company made its purchases, and after June, 1977, the prices to be paid by Lone Star Gas Company to said working interest owners for gas purchased from the well will continue to reflect the then current market value of gas produced from the existing Section 100 Well. * * *

\*  \*  \*  \*  \*  \*

"22.

"Defendant, in selling gas with respect to which it owes royalty under and pursuant to the terms of the leases described in subparagraphs (g), (h), (i), (j), (k), (l), (m), (n), (o), (p), (q) and (r) of Paragraph 13 hereof at less than the current fair market value thereof, and in dedicating said leases on June 1, 1975, to its November 18, 1969 Gas Purchase Contract with Pioneer Natural Gas Company as amended and supplemented as hereinabove set forth, breached the legal duties which it at all times pertinent has owed to those Plaintiffs in respect of the leases referred to in subparagraphs (g), (h), (i), (j), (k), (l), (m), (n), (o), (p), (q) and (r) of Paragraph 13 hereof.

\*  \*  \*  \*  \*  \*

"24.

"The language of the Oil and Gas Leases and the language of the Defendant's Division Orders signed by Plaintiffs, or some of them, do not change or alleviate Defendant's duties owed by it to its royalty owners in this suit in respect of the marketing of gas at obtainable market prices in which such royalty owners share

1. This same agreement provided that for gas produced from Section 81, the price would be

$1.00 per MCF with a 10¢ acceleration every five years.

in the whole benefit obtained by Defendant.

"25.

"The remedy of Plaintiffs claiming under the leases described in subparagraphs (g), (h), (i), (j), (k), (*l*), (m), (n), (*o*), (p), (q) and (r) of Paragraph 13 hereof for the period from first production through June, 1977, is to be paid their proportionate part of the difference in price per MCF of gas for each month of production between that paid by Pioneer Natural Gas Company and Odessa Natural Gasoline Company, on the one hand, and Lone Star Gas Company, on the other, less 7.5% thereof, representing production and severance taxes. In respect of production after June, 1977, Defendant should be ordered to pay Plaintiffs royalty as though the gas had been sold to Lone Star Gas Company under the contracts of Lone Star Gas Company for gas produced from the Section 100 Well."

## MARKETING DUTY

First and foremost is the question of whether Amoco breached any legal duty owed to these Appellees when, some twenty months after the Caprito 100 Well began producing gas, it committed and dedicated such gas to a long-term contract on terms approximately one-half the amount at which gas was then being sold to other purchasers from the same well and with no right for future price redetermination based on market increases, and while doing so obtained for itself extra benefits in respect to other properties in which these Appellees had no interest.

In 1976, this Court in *Pritchett v. Forest Oil Corporation*, 535 S.W.2d 708 (writ ref'd n.r.e.), based upon the facts set forth in that opinion, concluded that a lessee was not in the position of a trustee with regard to a pooled royalty owner and did not have any fiduciary obligation to such royalty owner. But other cases have clearly recognized a duty, particularly with regard to implied covenants, for a lessee to act fairly and in good faith with regard to the interest of a lessor of a mineral interest.

In *McCarter v. Ransom*, 473 S.W.2d 235 (Tex.Civ.App.—Corpus Christi 1971, no writ), the Court said:

"The doctrine of implied covenants applies with respect to oil, gas and mineral leases. Implied obligations are as much a part of the lease and are just as binding as though they were expressed. *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959); *Freeport Sulphur Co. v. American Sulphur Royalty Co.*, 117 Tex. 439, 6 S.W.2d 1039 (1928). Implied covenants are justified on the ground of necessity and fair dealing. *W. T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27 (1929).

\* \* \* \* \* \*

"In *Expando Production Company v. Marshall*, 407 S.W.2d 254 (Tex.Civ.App., Ft. Worth, 1966, wr. ref. n.r.e.), the Court said:

" 'There is no doubt but what there is a fiduciary obligation on the part of the lessee to exercise the utmost good faith toward the lessor in exercising the power granted under a pooling provision. \* \* \*'

"For other authorities holding that the lessee, in creating pooled units under a pooling provision in an oil, gas and mineral lease, is subject to the implied obligation that he act fairly, in good faith and with due regard for the interest of the lessor, see *Banks v. Mecom*, 410 S.W.2d 300 (Tex.Civ.App., Eastland, 1966, wr. ref. n.r.e.); *Tiller v. Fields*, 301 S.W.2d 185 (Tex.Civ.App., Texarkana, 1957, n.w. h.)."

In 1977, the Court in *Elliott v. Davis*, 553 S.W.2d 223 (Tex.Civ.App.—Amarillo, writ ref'd n.r.e.), noted that there is an implied requirement that the lessee exercise good faith in making the determination to pool. That opinion relies upon the standard of good faith described in Kuntz, The Law of Oil and Gas, Vol. 4, Sec. 48.3 at 219 (1972), as follows:

" \* \* \* Although it has been said that the lessee has a fiduciary obligation

in the exercise of the pooling power, it is submitted that the lessee is not a fiduciary and that standards applied to fiduciaries are entirely too strict. This is so because the lessee has not undertaken to manage and develop the property for the sole benefit of the lessor. The lessee has substantial interests that must be taken into account, and he should not be required to subordinate his own interests entirely to the interests of the lessor. Since his interests frequently conflict with those of his lessor, however, he must exercise the power in fairness and in good faith, taking into account the interests of both the lessor and lessee."

That decision was followed in *Amoco Production Company v. Underwood*, 558 S.W.2d 509 (Tex.Civ.App.—Eastland 1977, writ ref'd n.r.e.), where the Court affirmed a judgment based upon a jury finding that the designation of the pooled unit " 'was not made in good faith.' "

■ Those cases deal only with the pooling rights of the lessee and do not pass upon the marketing obligation of a lessee. Obviously, there is an obligation to market the product once it is discovered. Hemingway, The Law of Oil and Gas, Sec. 8.9(C) (1971). In this case, Amoco met that obligation by entering into a contract to sell the gas produced from the Caprito 100 Unit. But the most basic issue is whether there is a duty or implied covenant to market at any particular price, particularly when the lease provides for a royalty based on the "amount realized from such sale." We conclude there is an implied covenant to exercise good faith in the marketing of gas, and particularly so where the interests of the lessor and lessee are not identical. Professor Martin, in a recent article entitled "A Modern Look at Implied Covenants to Explore, Develop and Market Under Mineral Leases," says:

" * * * there is considerable authority that there is a duty owed by the lessee to obtain the best price possible for the gas, a duty which can arise either under a 'market value' or a 'proceeds' royalty clause. * * * "

Twenty-Seventh Annual Institute on Oil and Gas Law and Taxation (1976) 177 at 191.

In his text, Merrill, Covenants Implied in Oil and Gas Leases, 1940, the author on pages 212–214 says:

" * * * The concept of diligence in marketing should include the duty to realize the highest price obtainable by the exercise of reasonable effort. * * * [J]ustice toward the lessor would seem to require that he should receive the same return as those who had leased to other operators * * *. * * * [H]e is bound to get the best price he can."

The same pronouncement of this duty appears in Siefkin, "Rights of Lessor and Lessee with Respect to Sale of Gas and as to Gas Royalty Provisions," Fourth Annual Institute on Oil and Gas Law and Taxation (1953). In that article, the author on page 182 wrote:

"At all events, it is well settled that the lessee is impliedly obligated to 'market'—to sell or otherwise utilize—the production obtainable from a commercial well. Probably this requires the lessee to secure the highest price reasonably obtainable therefor * * *."

Some of the historical development of implied covenants is set forth in Summers, The Law of Oil & Gas, Vol. 2, Sec. 416 at 641 (1959). He says:

"The development of standards of diligence for measuring the performance of the oil and gas lessee's express and implied covenants arising from the policy of development, that is, covenants to test the land, to drill additional wells on discovery, to protect the land from drainage, and to market the product, has been an evolutionary process. These standards, their value for the purposes for which they were created, and their true meaning are perhaps best understood by tracing their origin and development through the decisions of the courts.

" * * * Justice Van Devanter, in *Brewster v. Lanyon Zinc Company* said: 'Whatever in the circumstances, would be reasonably expected of an operator of

ordinary prudence, having regard to the interests of both the lessor and his lessee, is what is required.' * * * "

The marketing covenant is also discussed in Williams and Meyers, Oil and Gas Law, Vol. 5, Sec. 856.3 (1977). This text states:

" * * * The greatest possible leeway should be indulged the lessee in his decisions about marketing gas, assuming no conflict of interest between lessor and lessee. Ordinarily, the interests of the lessor and lessee will coincide; the lessee will have everything to gain and nothing to lose by selling the product. Where the interests of the two diverge and the lessee lacks incentive to market gas, closer supervision of his business judgment will be necessary."

As noted in footnote 7 on page 410.3 of that text, where the interests of the lessee and lessor do not coincide, the lessee must be held to a stricter standard.

In *Le Cuno Oil Company v. Smith*, 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), cert. denied, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147, Chief Justice Chaddick considered the issue of marketing in a case where division orders provided for payment to the royalty owners based upon the price "received at the wells." In deciding this issue, he said:

" * * * It is in evidence that LeCuno took delivery of the royalty gas involved at the wellhead, ran it through its processing plant and delivered it to certain interstate gas transmission companies under contracts of sale which appellees had no part in making at a price agreed upon between LeCuno and the transmission companies. Such sales to the transmission pipe lines were bona fide arm's length transactions as between LeCuno and the transmission lines so far as this record reveals. Under the contractual relationship described above, LeCuno's division orders requiring it to account to the appellees for their royalty gas on the basis of *'the price received at the wells by LeCuno'* would require that LeCuno exercise the highest good faith in any contract it entered disposing of the royalty owners' gas."

Although the Court did not address the issue of the duty involved in marketing gas in *Livingston Oil Corporation v. Waggoner*, 273 S.W. 903 (Tex.Civ.App.—Amarillo 1925, no writ), it did recognize the right of a lessor to receive a royalty on gas sold based upon the reasonable market value rather than the price at which the lessee had contracted to sell the gas. And in *Harding v. Cameron*, 220 F.Supp. 466 (W.D.Okl.1963), the Court recognized the existence of an implied duty or obligation imposed by law which requires a prudent operator, having due regard for the interest of both the lessor and lessee, "to obtain a market for gas at the best price obtainable." In *Greenshields v. Warren Petroleum Corporation*, 248 F.2d 61 (10th Cir. 1957), cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262, the Court concluded that good faith must be explored by consideration of the circumstances then existing to see if more favorable terms could be obtained for the gas produced.

In Professor Merrill's volume on implied covenants, the 1964 supplement at page 67 contains an interesting comment with regard to a case which had a gas royalty clause providing for payment based on "net proceeds derived from the sale of gas at the mouth of the well." The author said:

"In *Phillips Petr. Co. v. Johnson*, 155 F.2d 185 (5th Cir. 1946), the court said of a stipulation for gas royalty measured by net proceeds at the mouth of the well, 'This lessor did not consent to be left to the uncertainties of "fair values", or even "market price", as to the gas, but was willing to take one-eighth of what the lessee sold it for, relying on the lessee's self-interest to secure a good sale.' This statement seems incorrect, if it is meant that the lessee was not bound, under such a provision, to exercise reasonable diligence to get the best available price. The same is true of the court's statement that the lessee is 'accountable for the actual net proceeds only, whether the residue gas was worth more or less.' "

In this case, Amoco by dedicating additional leases, including those of the Appellees herein, in June, 1975, obtained an increased price for gas already dedicated under the prior contract from 17¢ to 70¢ per MCF. This was obviously a substantial benefit for Amoco and its royalty owners under the previously dedicated leases. But it also meant that as to twelve of the leases involved in this case, the royalty owners would receive a payment for gas which was approximately ½ of the amount soon to be paid by Lone Star and Delhi, and with a very limited provision for future acceleration. This was not a substantial benefit to them as compared to other royalty owners whose gas was soon to be purchased by Lone Star and Delhi for $1.30, $1.90 and $1.95 per MCF.

Having concluded that Amoco had an implied covenant or duty to act in good faith when selling the gas of its royalty owners, we overrule Appellant's points of error asserting it had no such obligation by reason of the lease provision providing for payment of royalty based upon the proceeds realized from the sale of gas.

### BREACH OF DUTY

We next turn to the issue of whether the evidence supports the trial Court's finding of a breach of the legal duty owed by Amoco to its royalty owners. Only one witness, Tom Johnson, testified in this case. The record does contain many exhibits relative to interest ownership, gas sales agreements, and a recapitulation of prices paid by each of the four purchasers of gas since the initial production in 1973. At no time did Mr. Johnson express an opinion as to the fair market value of gas in Ward County, or from a particular field, or even from this particular well. Nevertheless, his testimony and the exhibit with the recapitulation of prices paid for gas purchased show without dispute what was being paid at various times for gas from this particular well by one who purchased under federal regulations, one who purchased under a long-term contract, and those who purchased with annual redetermination clauses.

■ Market value of gas is to be determined by sales of gas comparable in time, quality and availability of marketing outlets. *Texas Oil & Gas Corporation v. Vela*, 429 S.W.2d 866 (Tex.1968). This is usually established by opinions from expert witnesses who have evaluated gas sales in a given field and arrived at a price which they consider to represent fair market value at a given time. See *Butler v. Exxon Corporation*, 559 S.W.2d 410 (Tex.Civ.App.—El Paso 1977, writ ref'd n. r. e.); *Exxon Corporation v. Middleton*, 571 S.W.2d 349 (Tex. Civ.App.—Houston [14th Dist.] 1978, writ pending); *Exxon Corporation v. Jefferson Land Company*, 573 S.W.2d 829 (Tex.Civ. App.—Beaumont 1978, writ pending).

■ But that is not the exclusive manner of establishing market value. Professor Merrill, on page 213 of his book, notes that:

"While the highest price paid by any purchaser in the area is not necessarily the highest obtainable by the exercise of reasonable effort on the part of the particular lessee, it certainly is pertinent evidence."

We believe that which others pay for the same gas from the same well under an annual price redetermination clause is strong evidence of market value.[2] In the *Vela* case, the Court noted that the record showed the price paid by other purchasers in comparable sales, and concluded that such evidence supported the finding of the trial Court as to market value. In this case, we have evidence of sales of gas comparable in time, quality and availability of marketing outlets. Those sales prices become almost conclusive, particularly when there is no evidence to the contrary. Hemingway, supra, Sec. 7.4(C) at 319 (1971). We hold the evidence is sufficient to establish the trial Court's findings as to fair market value of these royalty owners' gas during the years in dispute. Points of error asserting to the contrary are overruled.

2. *Siefkin, supra*, n. 17 at 188. " 'Market' value is what the thing can be sold for. 'Actual' value is what the owner wishes he could find a sucker willing to pay."

## DIVISION ORDERS

Amoco also asserts that it has no liability for amounts in excess of those paid under the terms of its gas contract with Pioneer and Odessa because of division orders signed by the royalty owners. Each of the Appellees in this case executed a division order which describes the producing unit and contains the following language:

"The following covenants are parts of this instrument and shall be binding on the undersigned, their successors, legal representatives, and assigns:

\* \* \* \* \* \*

"Gas: Settlements for gas shall be based on the net proceeds at the wells, after deducting a fair and reasonable charge for compressing and making it merchantable and for transporting if the gas is sold off the property. Where gas is sold subject to regulation by the Federal Power Commission or other governmental authority, the price applicable to such sale approved by order of such authority shall be used to determine the net proceeds at the wells."

It can be seen that such orders do not really change the basis for calculating royalty payments from the terms of the lease. The lease refers to "the amount realized from such sale" and the division orders refer to "net proceeds at the wells." The division order does not purport to relieve the lessee from its duty to exercise good faith in obtaining market value for gas sold.

The actual purpose to be served by a division order is set forth in Brown, The Law of Oil and Gas Leases, (2nd ed. 1973) in Section 316.02 on pages 16–86, as follows:

" \* \* \* the main purpose of the typical division order is to protect the *purchaser* of products produced on a lease in a division of the proceeds, paid by him, among those entitled to share in such proceeds, namely, the lessee and the royalty owners. It was never intended to afford a *lessee* the opportunity to amend the lease, relieve himself of lease obligations, and secure advantages over the lessor which he could not have asserted under the provisions of the lease."

Professor Merrill treats this issue very realistically when he says:

" \* \* \* the purposes for which the [division] order is executed and the type of economic duress which prescribes it repel the implication that it is intended to affect the obligations of the operator to the royalty owner. The better reasoned decisions are in accordance with this view, and hence the mere execution of a division order, or the acceptance of payments in accordance therewith from the purchaser, ought not to preclude the royalty owner from asserting a breach of implied obligation against the operator."

Merrill, supra, 1964 Supp., Sec. 209A.

If, as the Court said in the *Le Cuno* case, the division orders which provide for payment based on the price received at the wells require the exercise of the highest good faith, the original obligation has not changed and the division orders do not diminish the duty owed to these royalty owners. And in this connection it must be noted that these division orders are with the lessee, Amoco, and not a third party purchaser. Thus we conclude that *Le Cuno* controls as to the facts in this case. Those points of error asserting to the contrary are overruled.

## FUTURE PAYMENTS

As set forth in finding No. 25, Amoco was ordered to pay royalty for gas produced after June, 1977 based upon the price at which Lone Star purchased gas from the well after that date. The judgment ordered future payments based on that standard. We conclude this was error.

First, these royalty payments are made monthly and the market can and does fluctuate at something other than annual periods. In addition, purchases by one individual buyer cannot be conclusive as to market price. Normally, market price is based upon a comparison of several sales of a given commodity at a given time and place. Generally, it is not tied exclusively to one particular sale. We recognize the

question is a close one where there are several purchasers of gas from the same well with annual redetermination clauses. Nevertheless, we reverse that part of the judgment as to payments for gas sold after June, 1977, and order that those payments be made based upon market value at the time of sale. Obviously, the purchase price paid by Lone Star may be the best evidence of the market value, but it is not conclusive. We sustain Appellant's Point of Error No. 13.

The judgment of the trial Court is affirmed, except as to the provision for payments of gas after June, 1977, and that part of the judgment is reversed and rendered so as to provide for such payments based upon market value of the gas sold at the time and place of sale.

PRESLAR, Chief Justice, dissenting.

I respectfully dissent.

This is an appeal from a judgment for the Plaintiffs to recover alleged deficiencies and royalty payments for gas produced under oil and gas leases providing for payment of a designated portion of the "proceeds" of the sale of gas. The trial Court, sitting without a jury, denied recovery for some Plaintiffs (who do not appeal) and allowed recovery by others, and the Defendant appeals that portion of the judgment. I would reverse and render the portion of the judgment appealed from.

Appellees brought this suit alleging that this is a suit for declaratory judgment under the Texas Declaratory Judgment Act to determine the correct computation of royalties due to be paid by Appellant to Appellees pursuant to terms of oil and gas leases held by Appellant and made by Appellees. It was pled, and is undisputed, that the lease provision here involved is the clause "provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale." There is no contention but that the gas was sold at the well, and it is also undisputed that the Appellant has fully complied with that clause and has paid each Appellee his share of the proceeds of all gas sold. What, then, is the complaint?

Appellees seek to recover additional money for their gas royalties on the theory that the Appellant has a duty to market the gas at its fair market value and failed to do so; that the fair market value is greater than that for which the Appellant marketed the gas, and that the Appellees are entitled to recover from the Appellant that difference.

On the face of things, Appellees seem to have been wronged for the circumstances under which the gas is produced and sold show that Appellees are being paid far less for their gas than are others. Their leases are pooled (as to which no complaint is made), and the very well from which their gas is produced is owned in varying proportions by different lessees, one of them being Appellees' lessee, the Defendant/Appellant. These different lessees have contracted to sell their gas at differing prices to four purchasers. Appellees' lessee has the lowest contract price. Therein lies the rub. Appellees alleged, and the trial Court agreed, that their lessee had an "implied duty" to make a better contract—an implied duty to get the going fair market value. The trial Court made the "going price," or fair market value to be paid, a monthly determination—a "current" market price. This, despite the fact that the gas was not sold monthly but one time under a long term contract at a fixed price. Appellees do not question Appellant's right to make such a contract.

By their oil and gas lease to Appellant, Appellees contracted that Appellant was the owner of such gas as it explored for, found and could produce, and that its obligation was to sell the gas and account to Appellees for their share of the sales proceeds. They have accepted and retained those proceeds. Do they now make out a case to excuse or abrogate the express provisions of their contract? They contracted for a share of "the amount realized from such sale."

It is elementary law that a party who enters into a written contract is bound by its provisions. *Pacific Mutual Life Insur-*

ance *Company v. Westglen Park, Inc.*, 160 Tex. 1, 325 S.W.2d 113 (1959). Appellees have no pleading of fraud, duress, mutual mistake, invalidity, or any of the other recognized legal reasons to excuse compliance with the provision of their contract providing they shall be paid the amount realized from sale of the gas. Appellees' legal reason for abrogating that provision of their contract is that the Appellant breached a duty "to act in good faith." The trial Court found that Appellant breached that duty "in selling gas with respect to which it owes royalty under and pursuant to the terms of the leases described . . . at less than the current fair market value thereof, . . . ."

We do not need to discuss or determine whether the failure "to act in good faith" is sufficient legal excuse to overcome the express contractual terms because it is evident from the record that there is no proof of any such failure to act in good faith. As is seen, the only "proof" is that Appellant sold its gas for less than others sold theirs. Obviously, this is not enough to sustain the judgment. Otherwise, all who have contracted for less than the top price paid by others are in default under their oil and gas lease regardless of reasons for entering such contract other than price. The contract under which the gas is sold contains many and varied terms that must be agreed upon by the contracting parties, and price is only one of such terms of the total contract. There is no showing here that Appellant at the expense of price entered into such terms as amounted to acting in bad faith or "failure to act in good faith." To the contrary, the evidence is that Appellant was originally bound to sell its gas for 17¢ per MCF but was able to renegotiate the contract and get 80¢ per MCF for the mutual benefit of it and Appellees.

The Court, in decreeing that Appellant must pay Appellees on the basis of market value determined on a monthly basis in the past and in the future, has made a new contract for the parties; under the oil and gas lease Appellant had the right to sell the gas on long term contracts; in fact, that is the expected and accepted method of sale in the industry. *Exxon Corporation v. Middleton*, supra. Courts cannot make a new contract for the parties. *Maryland Casualty Co. v. Hudgins*, 97 Tex. 124, 76 S.W. 745 (1903).

Even if we assume the rest of the judgment is correct, it is still erroneous as to the finding of "the fair market value" of the gas. The trial Court found as a fact that the price paid by *one* of the four purchasers was "the" market value. The evidence does not sustain such a conclusion. There were four different prices being paid and no evidence that any particular one of the four was the market price. The one witness who testified readily admitted that he was no expert in that field and did not know what the fair market value was. All purchasers of the gas did so under contracts involving far more than price alone. Many elements go into the makeup of fair market value. Those elements are not in evidence in this case.

There is yet another reason why the judgment cannot stand. The parties executed contracts known as "division orders," which recite that they are binding obligations and which provided that Appellees would be paid for gas based on the proceeds of sale. Even if we assume the trial Court is correct in allowing recovery by Appellees under the oil and gas leases, these division order contracts still present a bar to the recovery. They are binding contracts. *Chicago Corp. v. Wall*, 156 Tex. 217, 293 S.W.2d 844 (1956); *Shell Oil Company v. State*, 442 S.W.2d 457 (Tex.Civ.App.—Houston [14th Dist.] 1969, ref'd n. r. e.); *Pan American Petroleum Corp. v. Vines*, 459 S.W.2d 911 (Tex.Civ.App.—Tyler 1970, writ ref'd n. r. e.); *Le Cuno Oil Company v. Smith*, supra; *Exxon Corporation v. Middleton*, supra. Appellees have no pleadings to overcome these division order contracts and under the record here are bound by them. *Le Cuno Oil Company v. Smith* is directly in point in this case on two points. First, it upholds the validity of division orders as binding contracts. There, it was the royalty owners who sought to enforce the division orders against the lessee; as in our case, the lessee

was both producer and pipe line operator; the Court upheld the judgment of the trial court allowing recovery based upon provisions of the division orders. The Supreme Court of Texas refused error, n. r. e., and the Supreme Court of the United States denied certiorari. Secondly, the Court in *Le Cuno* had before it a question of reformation of the division orders for which there were no pleadings. The Court, still speaking through Chief Justice Chaddick, said:

"... Had LeCuno pleaded and proved that it was induced to enter into the division orders by the fraud of appellees or through mutual mistake, it, of course, would be entitled to a reformation setting out the true agreement of the parties. See 36 Tex.Jur., 773, Sec. 31 and p. 779, Sec. 35."

*Le Cuno* was cited in *Bankers Life Insurance Company of Nebraska v. Scurlock Oil Company*, 447 F.2d 997 (5th Cir. 1971), the Court saying:

"[1] It is settled law in Texas that a division order constitutes a contract between the interest owners and the pipeline purchaser. *Pan American Petroleum Corp. v. Long*, 5th Cir. 1964, 340 F.2d 211; *LeCuno Oil Co. v. Smith*, 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n. r. e.), cert. denied, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958); *Chicago Corp. v. Wall*, 156 Tex. 217, 293 S.W.2d 844 (1956)."

Under Rule 93(j), Tex.R.Civ.P., the issue of lack of consideration would require a verified plea, and that was not done in this case; the argument that the division orders are without consideration is not available to Appellees under the record. Also, there is the statutory presumption that written contracts of this nature import consideration. *Unthank v. Rippstein*, 386 S.W.2d 134 (Tex. 1964); *Maykus v. Texas Bank & Trust Company of Dallas*, 550 S.W.2d 396 (Tex.Civ. App.—Dallas 1977, no writ); *Exxon Corporation v. Middleton*, supra. There has been nothing offered in the case before us to overcome that presumption. The division orders in this case, in fact, amount to a

ratification of what was done by Appellant under the gas leases. The Appellee who testified in this case stated that when he signed the division order he knew that gas under his interest was being sold under contract to the Pioneer Gas Company, and that these matters were shown by a sheet attached to the division orders which the Appellees each signed. If, then, there was any failure of duty or failure to act in good faith in marketing the gas to Pioneer, the Appellees have ratified such conduct and are in no position to complain of it.

That part of the judgment of the trial Court allowing Appellees herein to recover should be reversed and judgment here rendered that they take nothing of the Appellant.