**Ivey Hugh RUTHERFORD, et al.,**
**Plaintiffs-Appellants,**

v.

**EXXON COMPANY, U.S.A., et al.,**
**Defendants-Appellees.**

No. 87–2789.

United States Court of Appeals,
Fifth Circuit.

Sept. 28, 1988.

Rehearing Denied Nov. 3, 1988.

**1142**

Erich W. Merrill, Memphis, Tenn., for plaintiffs-appellants.

Fulbright & Jaworski, David J. Beck, A. Frank Koury, Robert A. Burgoyne, J. B. Ruhl, Houston, Tex., for Exxon Co., U.S.A.

Michael W. Lattimore, Houston, Tex., for Amoco Production Co.

Donald Carroll, Tyler, Tex., for Fair Oil Co. and Herbert H. Fair.

Earl Sharp, Tyler & Fredonia, Longview, Tex., for Key Production Co.

F. Lee Lawrence, Tyler, Tex., for Bracken Oil Co.

William M. Huffman, Margaret I. Lyle, Marshall, Tex., for Dorothy Manziel, d/b/a Manziel Interests.

Jerry W. Ashby, Constance M. Walker, Houston, Tex., for Conoco, Inc.

Before CLARK, Chief Judge, GOLDBERG, and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

Oil is a fugacious mineral. Should one seek it without vigilance and determination, it easily evades recovery, and may slip away from the prospecting sophisticate and the neophyte alike. Oil lies at the core of this case. It also offers lessons that flow to the periphery of our decision.

This diversity action comes to us from the Eastern District of Texas. It concerns unitized oil production, royalty interests and fraud claims. Most important, it concerns Texas statutes of limitations. Appellants, Ivey Hugh Rutherford, Julius C. Rutherford, Doris P. Rutherford and Helen Rutherford Lyons ("the Rutherfords"), own property and an oil and gas lease in the Hawkins Field Unit ("HFU") in Wood County, Texas. Exxon Company, U.S.A. ("Exxon"), the primary Appellee, is the Rutherfords' lessee, the largest working interest owner in HFU and the unit operator. The other Appellees—Conoco, Amoco Production Company, Dorothy Manziel (d/b/a Manziel Interests), Bracken Oil Company, Key Production Company and Herbert Fair ("the other Appellees")—are also interest owners in the Hawkins Field.[1] Appellants are unhappy with HFU's productivity. They point their fingers at Exxon.

On motions for summary judgment, the district court held that Appellants' fraud-based claims were time-barred under Texas law and dismissed the suit. The court granted Exxon's motion for partial summary judgment with respect to all fraud-based claims against Exxon and severed those claims pursuant to Fed.R.Civ.P. 54(b). The court then issued final orders on all the claims involved in this appeal. We therefore have jurisdiction pursuant to 28 U.S.C. § 1291. After reviewing the record as a whole, we agree that it is unnecessary to determine whether Appellants' allegations are meritorious. In this case, time's incessancy has determined all that is before us.

---

1. Exxon and the Hawkins Field Unit are not strangers to the federal courts. *See United States v. Exxon Corp.,* 773 F.2d 1240 (Temp. Emer.Ct.App.1985), *aff'g* 561 F.Supp. 816 (D.D.C.1983), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), *reh'g denied,* 475 U.S. 1112, 106 S.Ct. 1526, 89 L.Ed.2d 923 (1986), —— U.S. ——, 108 S.Ct. 766, 98 L.Ed.2d 781 (1988).

## I. FACTS AND PROCEDURAL BACKGROUND

Fraud claims form the basis of this suit. The Rutherfords sued for common law fraud and requested rescission of the unitization agreement to which they are parties. They allege that in 1974, Exxon fraudulently induced them to become a party to the HFU unitization agreement by misrepresenting the production benefits that the Rutherfords would gain from unitization. Unitization of oil-producing leases allows an operator to enhance the recovery of crude oil by using gas or water injection techniques across lease lines when a reservoir's natural energy declines.

Appellants argue emphatically, as part of their attempt to avoid the defense of limitations, that Exxon owed them the duty of a fiduciary because Exxon is their lessee and the unit operator, and because they and Exxon have a long-standing business relationship. Their parents granted an oil and gas lease in 1937 which was assigned to Exxon's predecessor, and Exxon has operated oil wells on Appellants' property for many years before the present dispute arose. Appellants now derive a royalty interest from the lease.

For some time before June, 1974, Exxon had considered unitization of the oil producing leases in the Hawkins Field as a means of boosting production. Discussions ensued between Exxon and the other working interest and royalty owners concerning the potential advantages of unitization.

Before June, 1974, Exxon mailed a brochure to the HFU royalty interest owners, including the Rutherfords. The brochure emphasized unitization's benefits, stating that unitization "will extend the life of the field and increase ultimate recovery of oil by approximately 189 million barrels. This extra oil will increase the total royalty income you will receive in the future. The new operating program also will extend for at least three years the period of time the field can produce at its present rate." The brochure also stated that "A participation formula has been developed which insures that each tract or lease will receive more oil and gas production under unit operations than would otherwise be produced.... This participation formula assures that every lease, and therefore every owner, in the field will be allocated all of the oil and gas that the lease or owner would receive without a unit *plus* a fair share of the additional recovery resulting from unitization" (emphasis in original). Appellants predicate their allegations on the brochure's representations.

The Rutherfords, and other interest and royalty owners in the Hawkins Field, signed the unitization agreement in June, 1974. The Texas Railroad Commission considered the proposed unitization and issued an order that made the Hawkins Field Unit effective on January 1, 1975. *See* Tex. Nat. Res. Code Ann. § 101.013 (Vernon's 1978).

After unitization, and more than five years before the Rutherfords filed this suit, several key events occurred. In 1975, the Rutherfords noticed that Exxon was drilling more wells on their property than originally predicted. They asked an Exxon field employee for an explanation. The employee responded that it was necessary to drill the wells "in order to recover the oil." By 1978, the Rutherfords were aware that the amount of their monthly royalty checks had been declining. They were disturbed by the decline, and in addition to discussion among themselves, they asked an Exxon field employee to explain the circumstances. He responded that "production [was] dropping."

On February 8, 1980, still more than five years before this lawsuit was filed, Exxon directed a missive to the HFU royalty interest owners which the Rutherfords received and discussed. It stated in part that

> The purpose of this letter is to inform you of our current outlook for future oil production from the Hawkins Field Unit. On December 6, 1979, the Hawkins Field Technical Committee reviewed a comprehensive engineering and geologic study of the field's oil recovery. The study indicates a lower estimate of oil reserves and future oil production than had been estimated from the data previously available.

Even with extensive field work to maintain maximum production, decline in production rate began earlier than originally predicted. The field's production has declined faster than capacity can be added by drilling or by workovers of existing wells. In our opinion, production from the field will continue to decline at a rate of 15 to 20 per cent per year. This decline rate is an estimate based on data available at this time. As with any estimate of this nature, it may change as additional production history is obtained.

These events did not fade quickly from the Rutherford memory. In 1982, more than two years but fewer than four years before this suit was filed, Appellants asked their attorney "why Exxon was drilling so many wells on [their] land." Appellants' Brief at 13. "After questioning [Appellants] closely ... [he told them] that, in his opinion, Exxon was drilling so many wells because the oil under [their] property was in separate pockets that would not be affected by secondary recovery; that it was his opinion that the Hawkins Field was not a continuous field, but was a highly fragmented field made up of numerous separate pockets of oil." *Id.* at 13–14. It is relatively efficient to extract oil from a continuous reservoir. More extensive production efforts are required when scattered oil pockets dominate a field.

In March, 1983, the Rutherfords filed suit in federal district court. They alleged that Exxon had fraudulently induced them to sign the unitization agreement by stating that the Hawkins Field was a continuous reservoir, and that unitization would therefore benefit them significantly when it actually would not. Apparently, Appellants believe that their land is particularly oil-rich, and that unitization allowed Exxon access to their treasure at their expense. We note as an aside, however, that we have difficulty discerning from the record Exxon's incentive to defraud the Rutherfords.

The district court, pursuant to the Rutherfords' motion on the day of trial, allowed them to dismiss their suit voluntarily, without prejudice, provided, among other things, that they would pay Exxon fifty thousand dollars if they refiled their fraud claims. This suit was filed in Texas state court on November 7, 1985. The case was removed to federal court pursuant to 28 U.S.C. § 1441. The Rutherfords have reasserted their fraud claim in tort (naming the other Appellees in addition to Exxon) and have added a request for rescission of the unitization agreement based on Exxon's alleged fraudulent representations. Appellants' allegations center on Exxon's conduct. Because the claims against the other Appellees are subordinate to the Exxon-related claims, and because we find that all claims involved in this appeal are time-barred in any event, we refer only to the allegations against Exxon for the sake of simplicity.

## II. DISCUSSION

The district court dismissed the Rutherfords' claims as time-barred. The only issue before us is whether the district court properly granted summary judgment by applying the Texas law of repose, which controls in this diversity action. *See L.C.L. Theatres v. Columbia Pictures Industries,* 566 F.2d 494, 496 (5th Cir.1978).

Summary judgment is appropriate if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We and the district court apply the identical standard. *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355 (5th Cir. 1988); *Berkley v. American Cyanimid Co.,* 799 F.2d 995, 997 (5th Cir.1986). The entire record, then, lies open before us for review.

The issues in this case are well-defined. We must determine when the claims accrued. Whether Exxon owes Appellants a fiduciary duty bears on the accrual question. Once we determine when the claims accrued, we must apply the appropriate statutes of limitations. We come to three conclusions. First, we discern no evidence in the record suggesting that Exxon owed the duties of a fiduciary. Second, the claims have accrued. Finally, the limitations periods have expired.

A. Accrual of Claims.

1. *Applicable Legal Standard.* We need no divining rod to determine when fraud claims accrue in Texas. The two year limitations period begins to run "when [the] plaintiff kn[ows] of the alleged wrongdoing or [should have known] of facts sufficient to excite such inquiry as would have been made in the exercise of reasonable diligence." *Ryan v. Collins,* 496 S.W.2d 205, 211 (Tex.Civ.App.—Tyler 1973, writ ref'd n.r.e.); *Quinn v. Press,* 135 Tex. 60, 140 S.W.2d 438, 440 (1940); *Glenn v. Steele,* 141 Tex. 565, 61 S.W.2d 810, 810 (1933) ("Knowledge of facts that would cause a reasonably prudent person to make inquiry which would lead to a discovery of the fraud is in law a knowledge of the fraud"); *Bass v. James,* 83 Tex. 110, 18 S.W. 336, 337 (1892); *see Coastal Distributing v. NGK Spark Plug Co.,* 779 F.2d 1033, 1037 (5th Cir.1986); *Westchester Corp. v. Peat, Marwick, Mitchell,* 626 F.2d 1212, 1217 (5th Cir.1980). Thus, loud, resonant cries to the world of "fraud" are not necessary to set the clock's gears in motion.

The diligence requirement also applies to contract actions in equity. "The rule is well-settled that the statute of limitations begins to run at such time as the fraud is discovered, or by the exercise of reasonable diligence might have been discovered." *Courseview, Incorporated v. Phillips Petroleum Co.,* 158 Tex. 397, 312 S.W.2d 197, 204–05 (1957). The rule has aged antecedents in Texas law. "[A] party seeking to rescind a contract for fraud cannot speculate on the situation, but must act promptly after discovering the fraud, and notice of facts and circumstances which would put a man of ordinary prudence upon inquiry is in the eye of the law equivalent to a knowledge of all the facts a reasonably diligent inquiry would disclose." *Barr v. McCauley,* 240 S.W. 961, 963 (Tex.Civ.App.—El Paso 1922, no writ); *see Saunders v. Alamo Soil Conservation District,* 545 S.W.2d 249, 251 (Tex.Civ.App.—San Antonio 1976, writ ref'd n.r.e.); *McMullen Oil and Royalty Company v. Lyssy,* 353 S.W.2d 311, 314 (Tex.Civ.App.—Austin 1962, no writ). With the reasonable diligence standard in mind, we turn to the circumstances of this case.

2. *Fiduciary Duty?* Appellants argue that Exxon owed them a fiduciary duty that prevented the cause of action from accruing before 1982. The relationship of the parties serves as a factor in the "reasonable diligence" calculus. *Courseview,* 158 Tex. 397, 312 S.W.2d at 205; *Andress v. Condos,* 672 S.W.2d 627, 630 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). As the legal duties of one party become more strict, the resulting trust and confidence in the other party alter the content of the phrase "reasonable diligence" within the particular relationship. Relations of trust and confidence must exist before a party is held to the duties of a fiduciary. *Texas Bank and Trust Co. v. Moore,* 595 S.W.2d 502 (Tex.1980). The Rutherfords contend that Exxon was their fiduciary as the operator of the Hawkins Field Unit, as their lessee and as a result of their long-standing relationship. They assert that Exxon, as a fiduciary, had a strict duty to disclose information that Exxon breached in this case, and which consequently prevented the claims from accruing until after 1982 because the Rutherfords were, in effect, prevented from acting as a result of their blind faith in Exxon.

Several rules and standards affect this issue of duty. First, fiduciary duties arise from the facts and circumstances of particular relationships. They do not stem *per se* from, for example, contracts that evidence a relationship, although contracts may determine what constitutes the substance of a relationship. *Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984). The lease and unitization agreement in this case are standard documents. They do not impose strict or unusual duties on Exxon.

Second, Appellants maintain that because Exxon leases oil rights from them, and operates the Hawkins Field Unit pursuant to a unitization agreement to which they are parties, Exxon owes them the duties of a fiduciary. Texas law, however, does not impose the obligations of a fiduciary in either event based on status alone. *Pritch-*

*ett v. Forest Oil Corporation,* 535 S.W.2d 708, 709 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.); *Elliott v. Davis,* 553 S.W.2d 223, 226 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.); *see Amoco Production Co. v. First Baptist Church,* 579 S.W.2d 280, 284–85 (Tex.Civ.App.—El Paso 1979), writ ref'd n.r.e., 611 S.W.2d 610 (Tex.1981). The Texas courts require "fairness" and "good faith" from a lessee and unit operator, duties which fail to rise to the level expected of a fiduciary. *Texas Oil & Gas Corp. v. Hagen,* 31 Tex.Sup.Ct.J. 140 (Dec. 16, 1987) [available on WESTLAW, 1987 WL47847]; *Elliott,* 553 S.W.2d at 226; *Pritchett,* 535 S.W.2d at 710. Based upon our review of the record, we find no evidence which suggests that Exxon acted in bad faith or unfairly either as lessee or unit operator.

Finally, Appellants contend that Exxon owed them the duties of a fiduciary based on their common history. Exxon operated oil wells on the Rutherfords' property before unitization, and the Rutherfords duly received their royalty shares over the years. Appellants try mightily to characterize this regular and ongoing business relationship as something highly personal, and something responsible for the Rutherfords' failure to allege fraud until 1983. However, "[p]roving the necessary confidential relationship requires more . . . than evidence of prior dealings between the parties. . . ." *Consolidated Bearing v. First National Bank,* 720 S.W.2d 647, 649 (Tex. App.—Amarillo 1986, no writ). We discern nothing unusual in the dealings between Exxon and the Rutherfords which created a relationship characterized by confidence and trust. Women, men and companies in positions of the parties in this case *do business* based on the understanding that those involved in the relationship may be trusted, in the colloquial sense of the term. *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962); *see Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966); *Thomson v. Norton,* 604 S.W.2d 473, 476 (Tex.Civ.App.—Dallas 1980, no writ) ("Most contracting parties have some degree of trust and confidence in each other, or they would not make a

deal") (citing *Thigpen,* 363 S.W.2d at 253). We cannot equate faith built up over years of a business relationship such as the one in this case with the confidence that, for example, a client places in her attorney. And even assuming that the Rutherfords trusted Exxon as a client trusts her attorney, Texas law does not allow one party's perceptions to form the predicate of a fiduciary relationship. *Thigpen,* 363 S.W.2d at 253; *Consolidated Bearing,* 720 S.W.2d at 649; *Consolidated Gas,* 405 S.W.2d at 336.

Appellants rely primarily on *Bush v. Stone,* 500 S.W.2d 885 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.), in arguing that Exxon owes them the duties of a fiduciary. The degree of their reliance demonstrates the evanescence of their argument. In *Bush,* the plaintiff was a farmer. The defendant, also a farmer, had agreed to gin the plaintiff's cotton, process his grain, and sell the product. The plaintiff sued for fraud in accounting for the sale of the cotton and grain after processing. The trial court granted summary judgment for the defendant on several grounds, including the absence of a fiduciary relationship. The appellate court reversed, holding in part that the question whether the defendant was a fiduciary should have gone to the jury.

A fact issue existed in *Bush* for reasons that have no application in this case. The parties in *Bush* "worked together, they had repeated business contacts, and were close family-type friends. . . . [T]he defendant acted in one sense as a banker and partner for the plaintiff. He obtained and guaranteed loans for him. The defendant collected funds. He held them in a "trust" type relationship for later disbursement. He acted as plaintiff's agent in receiving money from the sale of cotton and grain and upon plaintiff's order disbursed payments to plaintiff's mortgagee and other creditors." *Id.* at 888–89. Moreover, "the plaintiff and defendant became close personal friends . . . and remained as such for . . . 26 years. The plaintiff trusted the defendant the same as if he were a member of his own family. In fact, plaintiff's older brother lived for many years in defendant's

father's home. On at least one occasion the plaintiff stayed the entire summer in the defendant's father's home. The plaintiff and defendant had repeated business contacts throughout the years. They hunted, visited, and had repeated social contacts together." *Id.* at 887–88.

The familial and neighborly underpinnings to the trust relationship in *Bush* do not exist here. And the commonality in the cases of a long-standing business relationship does not draw this case within the scope of *Bush* or other Texas decisions that have recognized fiduciary relationships. We cannot extract merit from this empty reservoir of argument.

■ 3. *Applying the Standard.* Having determined that Exxon on these facts owed no duty to the Rutherfords that materially affects the "reasonable diligence" standard, we must decide what constitutes reasonable diligence in this case. The question is not close given the undisputed facts in the record. Appellants were well aware in 1975 that Exxon was drilling more wells on their property than they expected Exxon to drill when they discussed unitization. They proceeded to ask field employees why it was necessary to drill the wells, and received cursory answers. Furthermore, the Rutherfords were disturbed by the decline in the amount of their royalty checks in 1978, and believed that the results of unitization were not meeting their 1974 expectations. Again, their uncertainty caused them to ask an Exxon field employee to explain the circumstances. The February, 1980 letter from Exxon merely made explicit the production problems in the Hawkins Field Unit regarding which the Rutherfords had previously expressed concern.

Appellants remained sufficiently disturbed in 1982 by these facts to ask their attorney why Exxon was drilling so many wells. The 1982 "investigation" led to the 1983 lawsuit. The operative underlying facts in 1982 were substantially the same as they were even in 1975. And by 1980, Appellants had been bombarded by information that distressed them no later than 1982. On these facts, a reasonably prudent person exercising reasonable diligence in early 1980 could have discovered as much as the Rutherfords knew in 1983, when they sued for fraud. Thus, the fraud claims accrued under Texas law by February, 1980 at the latest.

The Rutherfords make an effort to avoid the operation of the "reasonable diligence" rule by arguing that they could not have made productive further inquiry of Exxon and that, in effect, nothing further existed to discover by making inquiry. Given the facts which caused the Appellants to do as much as they did in 1982, we see no reason why they could not have approached Exxon executives or a geologist, for example, in an attempt to uncover additional information by March of 1980. Reasonable diligence demands no less.

B. Applicable Periods of Limitation.

Our remaining task is to apply the Texas statutes of limitations to the Appellants' claims. Texas requires litigants to file a claim for fraudulent misrepresentation within two years of the action's accrual date. *Ruebeck v. Hunt,* 142 Tex. 167, 176 S.W.2d 738, 739 (1943); *Quinn v. Press,* 135 Tex. 60, 140 S.W.2d 438 (1940); *Ryan v. Collins,* 496 S.W.2d 205, 210 (Tex.Civ. App.—Tyler 1973, writ ref'd n.r.e.); *see Mooney v. Harlin,* 622 S.W.2d 83, 84–85 (Tex.1981); *Neill v. Yett,* 746 S.W.2d 32, 35–36 (Tex.Civ.App.—Austin 1988, writ denied); *see also Berkley,* 799 F.2d at 998; *Coastal Distributing,* 779 F.2d 1033; *Westchester Corp.,* 626 F.2d at 1216; Tex. Civ.Prac. & Rem.Code § 16.003 (Vernon's 1986). We are assuming that Appellants have set forth a proper rescission claim.[2]

---

**2.** The rescission claim somewhat resembles a three-legged chair. First, it may constitute an impermissible collateral attack on the order of the Texas Railroad Commission that made the unitization agreement effective. *See Magnolia Petroleum Co. v. Railroad Commission,* 128 Tex. 189, 96 S.W.2d 273, 275 (1936) ("[A]n order of the Railroad Commission, regular on its face, is presumed to be valid, and will be enforced unless set aside in a direct proceeding brought for that purpose; and, further, it is not subject to collateral attack"); *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961, 967 (1945); *Exxon Corp. v. First National Bank of Midland,* 529

Texas courts have applied a four year limitations period to rescission actions based on allegations of fraud. *Leonard v. Eskew,* 731 S.W.2d 124, 134–35 (Tex.App.—Austin 1987, writ ref'd n.r.e.); *Allen v. Great Liberty Life Insurance Company,* 522 S.W.2d 247, 250 (Tex.Civ.App.—Eastland 1975, writ ref'd n.r.e.); Tex.Civ.Prac. & Rem. Code § 16.051 (Vernon's 1986).

 Applying the periods of limitation, we are left with no uncertainty. The fraudulent misrepresentation claim is barred even assuming that the Rutherfords were reasonably diligent to the present day. Appellants state unequivocally in their briefs that they "discover[ed] Exxon's misrepresentations as to existing facts" in 1982, when they consulted their attorney. Their awareness, and the filing of their first suit, came to pass well over two years before this suit was filed on November 7, 1985. At oral argument, counsel for the Rutherfords even conceded that the two year statute of limitations had passed. In any event, Appellants meet with no more success when we apply the four year period of limitations. They sued on November 7, 1985. Because the damages claim and the rescission claim accrued no later than February, 1980, the Rutherfords filed their claims well over a year late.[3]

## CONCLUSION

The Hawkins Field unitization agreement, and the relationships which revolve around it, are creatures of modern jurisprudence. But ancient doctrines of the common law apply here with unexceptional

S.W.2d 110, 114 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r.e.); *Combs v. State,* 526 S.W.2d 648, 649 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). Moreover, Texas law concerning election of remedies may affect claims in a case such as this one. Several Texas courts have taken the position that "when a plaintiff brings suit by reason of alleged fraudulent conduct he must elect between suing for damages or for cancellation and rescission of a contract. . . ." *Blum v. Elkins,* 369 S.W.2d 810, 812 (Tex.Civ.App.—Waco 1963, no writ); *Burroughs Corp. v. Farmers Dairies,* 538 S.W.2d 809, 810 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.) (collecting cases). Because we affirm the judgment below on limitations grounds, how-

force. Before the clerk's stamp made its mark, the sands of the hourglass had settled peacefully. The claims before us are time-barred, and the judgment of the district court is AFFIRMED.

ever, we find it unnecessary to decide these issues.

3. We have considered the Rutherfords' remaining arguments. They are meritless. In addition, the Appellees other than Exxon have requested sanctions against the Rutherfords pursuant to Fed.R.App.P. 38. We are not reluctant to impose sanctions in appropriate cases. But we require more egregious circumstances than these before we will sanction such harsh penalties. *Compare Exhibitors Poster Exchange, Inc. v. National Screen Service Corporation,* 543 F.2d 1106, 1107 (5th Cir.1976) (Rule 38 motion granted where appellant, after protracted proceedings, continued to argue that a summary judgment does not have issue preclusive effect).