43 F.3d 953
 Silvia Moroder Leon y CASTILLO; Inigo Coca Moroder;
Francisco de Borja Coca Moroder; Alvaro Coca Moroder;
Victor Coca Moroder; Otilia Coca Moroder ("Coca Family");
Cia. de Inversionses de Castilla y Leon, S.A. (COINSA); and
Agricola Industrial Ganadera, S.A. (AIGSA), Plaintiffs-Appellants,
v.
FIRST CITY BANCORPORATION OF TEXAS, INC., et al., Defendants,
Keck, Mahin & Cate; and Henry S. Landan, Defendants-Appellees.
 No. 93-2447.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 16, 1994.
 
 Sidney Powell, Dallas, TX, Graham Kerin Blair, Norton & Blair, Houston, TX, for appellants.
 William Key Wilde, Tracie J. Renfroe, Bracewell & Patterson, Houston, TX, for appellees.
 Appeal from the United States District Court for the Southern District of Texas.
 Before WISDOM and JONES, Circuit Judges, and FITZWATER*, District Judge.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 Spanish citizens and their closely held companies appeal a summary judgment on claims asserted against an American lawyer and his law firm. Appellants allege that the lawyer breached various duties in the course of representing the lender and the "administrator" of the appellants' foreign properties pledged as security for a $120 million loan. We affirm in part, reverse in part, and remand.
 
 I. FACTS
 Background
 
 2
 According to the summary judgment evidence, the appellants are members of the Coca family and their closely held companies. In July 1989, the Coca family[1] owned and managed prime real estate and resort properties throughout Spain. Two of the family's companies, the Los Monteros Group and INCOSOL, owed $120 million that had to be refinanced or paid off by 12:01 a.m. July 13, 1989. Otherwise, a guarantor would exercise its option to purchase the real estate assets of the Los Monteros Group for approximately $123 million. The value of these properties was between $180 million and $247 million. Efforts to sell property to avoid heavy losses were unsuccessful.
 
 
 3
 Around April 1989, the Cocas came into contact with First City Bancorporation of Texas, Inc. and its vice chairman, Frank Cihak. Cihak and others had purchased First City in 1988 with the assistance of the FDIC and were aggressively pursuing new loans and other revenues to finance the acquisition.[2] Discussions among First City, its lawyer, and the Coca family led to a June 15, 1989 letter of intent from First City to the Cocas arranging $120 million in refinancing.
 
 
 4
 The arrangement was unusual in two respects.[3] First, First City did not lend the money directly, but issued an irrevocable letter of credit in favor of the Cocas to a Spanish bank which lent the money. In exchange for the letter of credit facility, the Cocas pledged numerous real estate assets owned by them and their corporations to First City. The second unusual aspect was that First City required the Cocas to turn over administrative control of their mortgaged assets to a "fiduciary" which would also oversee the sale and management of the mortgaged properties. Although First City's final commitment letter to the Cocas ostensibly required the Coca family "to designate a Fiduciary," in reality the Cocas could only choose a fiduciary "selected" by First City. The entity selected by First City for this task was the Pelican Group, Inc., a privately held corporation 100% owned by E. Kevin Hart, its president. First City had hired Pelican in September, 1988, to render real estate consulting services as directed by the bank.
 
 
 5
 The central character in this lawsuit is Henry S. Landan, a partner with the law firm of Keck, Mahin & Cate (KMC) in Chicago, whom Cihak had hired as its U.S. legal counsel around May, 1989 to help structure the credit transaction. First City also hired Spanish counsel, but Landan was the key figure in the transaction until the last quarter of 1990. As negotiations with the Cocas progressed, Landan was also retained to advise Pelican in all aspects of the credit transaction. According to Landan, he was hired to represent Pelican at the joint request of Cihak, First City's general counsel, and Kevin Hart. The Cocas were represented in the transaction by English legal counsel.
 
 
 6
 The scope of Landan's and Pelican's activities and representations are crucial to this appeal. More details will be discussed below, but the summary judgment evidence suggests that after the deal closed Landan largely assumed the task of overseeing the administration of the properties and managing and brokering their sale. At some point Landan acquired the title of "assistant secretary" of Pelican and acted as Pelican's attorney-in-fact. The evidence suggests that Landan was intimately involved with all aspects of Pelican's activities with the Coca properties, including soliciting potential buyers for the properties, contracting with outside parties to manage the properties, negotiating and closing sales of mortgaged and nonmortgaged properties, and basically assuming the "sole administrator" role assigned to Pelican.
 
 
 7
 Landan and Hart do not dispute, on appeal, that Pelican and Landan managed the properties poorly. The Cocas' relationship with First City, Pelican, and Landan allegedly resulted in the imposition of huge liabilities on the family's companies, severe disruptions in their cash flow, large trade debt, strained relationships with their trade unions, overdue tax liabilities, and a greatly diminished valuation of their assets. These circumstances and the failure to sell the bulk of the marketed assets allegedly led the Coca family to default on its loan to the Spanish bank in July, 1990, prompting that bank to call on First City's letter of credit.
 
 
 8
 As examples of Landan's alleged gross mismanagement, the Cocas highlight three transactions in which Landan was allegedly intimately involved.
 
 
 9
 The El Palmeral Deal: Before the default, Pelican, through Landan, actively began to market Coca properties to meet interest payments. One of the first deals consummated was the January 1990 sale of property known as El Palmeral for $9 million, allegedly to a major shareholder of First City. Appellees claim that this property was worth $22 million. They further assert that $1 million of the purchase price was diverted to First City via a "secret commission." It is alleged that Landan controlled this transaction; he signed the contractual documents on behalf of the Cocas' companies, First City,[4] and Pelican.
 
 
 10
 The J.T. Lundy Transaction: In February 1990, Landan arranged a sale of $5.2 million of Coca stock and artwork that were not part of First City's loan collateral. The borrower, J.T. Lundy, was allegedly a cohort of First City and Cihak. First City lent the entire $5.2 million of the sale price to Lundy, bypassing Lundy by transferring the money within First City to service the Cocas' debt. The record suggests that Landan was the key figure involved in structuring and closing the transaction.
 
 
 11
 Whitehall/Western Hemisphere Holdings (WHH): In the summer of 1990, Landan contracted managerial control of most of the mortgaged assets to a Mr. Freddi Sidi of Western Hemisphere Holdings, another alleged cohort of Cihak. Landan did this after setting up a deal whereby Sidi could buy the corporations and property for $150 million, again financed by First City. The Cocas allegedly resisted the transaction, and it appears that officials within First City were also distrustful of Sidi, describing him as "a flake" and his company as a "joke." Eventually, Landan terminated Sidi's management contract and halted the sale negotiations.
 
 
 12
 In August, 1990, Landan turned the Coca companies over to Carlos Fonts, who was also allegedly connected with Cihak as well as with Sidi. Kevin Hart, Pelican's president, stated in an affidavit that he expressly objected to Landan's transferring control of the companies to Fonts.
 
 The Proceedings Below
 
 13
 About sixteen months after the July 1990 default, First City began foreclosure proceedings on the mortgaged properties in the Spanish courts. In April 1992, the Coca plaintiffs filed suit in Texas against First City, Pelican, Landan and his law firm, as well as numerous individuals. The Cocas eventually settled in July, 1992 with all defendants except for Landan and his law firm, KMC.[5] The Cocas' amended complaint against Landan and KMC alleged breach of fiduciary duty, breach of contract, fraud and civil conspiracy, duress, negligence, and disregard of Pelican's corporate status.
 
 
 14
 The magistrate judge denied appellees' motion for summary judgment, ruling that there were genuine issues of material fact concerning whether Landan acted outside of the traditional role of attorney for Pelican and First City; whether Pelican owed the Cocas a fiduciary duty; whether Landan, acting as an officer or attorney-in-fact of Pelican, breached fiduciary duties; whether Landan negligently managed the Coca family properties when he acted as Pelican's officer; whether he breached contractual duties in carrying out his various duties; and finally, whether Landan had made material misrepresentations to the Cocas, including (a) the merits of the proposed financing with First City; (b) the nature of Pelican's role under the agreement; and (c) Landan's personal role as it related to Pelican.
 
 
 15
 On review, the district judge refused to adopt the recommendations of the magistrate judge. First, he found that there was no genuine issue as to Landan's loyalty because he always represented himself to be an attorney for First City and Pelican. Second, the judge held that under Texas law the Cocas were at best merely third party beneficiaries to First City's and Pelican's contracts with Landan, and therefore, Landan owed the Cocas no special duties for which he could be liable in this case. The judge also ruled that the Cocas had not pled fraud with sufficient particularity to survive dismissal under Fed.R.Civ.P. 9(b), that the Cocas' duress claims were barred by the statute of limitations, and that the Cocas' negligence and breach of contract claims were similarly barred because as mere lawyers to the lender and Pelican, the lawyers did not directly owe duties to a third party beneficiary. Finally, the district court rejected the plaintiffs' claims that Pelican was merely a sham set up by Landan and his law firm to perpetrate a fraud on the Cocas.
 
 II. DISCUSSION
 
 16
 A. Was Landan A Fiduciary for the Cocas?
 
 
 17
 In Texas, "A fiduciary relationship is an extraordinary one and will not lightly be created." Tel-Phonic Services, Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1143 (5th Cir.1992). Further, in Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 594 (Tex.1992), the Texas Supreme Court held that the existence of a confidential relationship, an "informal relationship[ ] [giving] rise to a fiduciary duty," is usually a question of fact unless the issue is one of no evidence. See also Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir.1984) (summary judgment granted where no relevant evidence created fact question on existence of a fiduciary duty between operator and interest owners in oil and gas leases).
 
 
 18
 The record is replete with evidence tending to show that the Cocas were harmed by Landan's poor administration of their properties. The Cocas' negligence claim is viable only if Landan had a duty to them; the parties therefore devote much of their briefs to the question whether Landan owed the Cocas a fiduciary duty. The Cocas have five theories as to how this duty arose. First, that Landan acted as the Coca family's legal counsel during the refinancing negotiations in the summer of 1989. Second, that Landan acted as agent for the Coca family and their companies in arranging the sale of their properties. Third, that Landan owed the Cocas a fiduciary duty through his de facto control of Pelican, which was in turn allegedly a fiduciary for the Cocas. Fourth, that Landan, again through Pelican, owed a fiduciary duty to the Cocas as a broker of their properties. And finally, that Landan, through Pelican, was a trustee under a deed of trust with commensurate fiduciary duties. We discuss each of these theories in turn.
 
 
 19
 The Cocas presented evidence that Landan dispensed legal advice directly to the Cocas regarding the structure of the letter of credit transaction. Inigo Coca Moroder stated in his affidavit that Landan "discussed freely and gave advice" regarding the sale of the Coca properties. The Cocas' British attorney also testified that Landan advised the Cocas regarding sales of their property. Finally, Kevin Hart, President of Pelican, stated in his affidavit that he observed Landan giving advice and personal opinions to the Cocas regarding the First City loan transaction and sale of the Coca properties. Accepting these statements as true, such consultations could in some circumstances create an attorney client relationship and its attendant strict fiduciary duties. See Perez v. Kirk & Carrigan, 822 S.W.2d 261, 265 (Tex.App.--Corpus Christi 1991, writ denied); Simpson v. James, 903 F.2d 372, 376 (5th Cir.1990).
 
 
 20
 All three of the above affiants nevertheless acknowledged that they identified Landan as First City's legal counsel throughout the negotiations leading up to the loan transaction. Moreover, the Cocas were represented by their own legal counsel during the $120 million loan negotiations. But even if Landan was especially helpful to them and freely gave advice, the fact that they may have subjectively trusted Landan and relied on him, without more, is insufficient to create a fiduciary relationship. Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 595 (Tex.1992); Tel-Phonic Services, 975 F.2d at 1143; Lee v. Wal-Mart Stores, Inc., 943 F.2d 554, 559 (5th Cir.1991); Rutherford v. Exxon Co., 855 F.2d 1141, 1146 (5th Cir.1988). We agree with the district court that as a matter of law, Landan's legal discussions with the Cocas did not create an attorney-client relationship giving rise to a fiduciary duty.
 
 
 21
 Appellants' second and third theories of fiduciary duty depend on the character of the relationship between Pelican and the Cocas. These theories are that Landan either acted outside his role as an attorney in negotiating and consummating sales of the Cocas' properties or that he became a fiduciary for the Cocas because Pelican, which he served as attorney and corporate secretary, was their fiduciary.
 
 
 22
 It is not easy to characterize Pelican's role in this case, or to determine, on the record before us, whether Landan undertook fiduciary duties as an agent or lawyer for Pelican or on his own in some broader transactional sense. The evidence is contradictory.
 
 
 23
 The July 11, 1989 commitment letter from First City to the Cocas stated that the Coca family would be obliged to designate a "fiduciary," as selected by First City. The document further required the Coca family to execute all appropriate legal instruments to "authorize the independent discretionary fiduciary responsibilities contemplated herein." All of this language was consistent with the terms of the letter of intent signed by Kevin Hart and sent to the Cocas on First City letterhead in June 1989.
 
 
 24
 On their face, the documents do not say for whom Pelican was to exercise its "independent discretionary fiduciary responsibilities." The Cocas point to the deed of agreement signed July 12, 1989 between Pelican and the Coca family, which recited that the Coca family would "entrust" their properties to Pelican which would in turn "diligently oversee" the administration of the properties to "assure that they attain their optimal price." In his affidavit, Landan stated that he considered his representation of Pelican to be "an extension of [my] legal services to the bank because Pelican was the bank's administrator of the Cocas' collateral."[6] Landan's affidavit is arguably contradicted by a memo he wrote to Kevin Hart in February 1990, in which he emphasized, "it is essential to keep in mind that, legally speaking, Pelican Group, Inc. ("Pelican"), in its capacity as Sole Administrator of the Coca Corporations, is totally unrelated to First City...." Cihak testified in his affidavit that Pelican's role fell within a preexisting consultancy retainer, in which First City hired Pelican to coordinate the bank's real estate disposition efforts and work on other real estate projects. Affidavits from Hart, Pelican's President, and Coca family members state that they believed that Pelican was the family's fiduciary to which they entrusted their assets. Other evidence is equally irreconcilable. Landan and his firm argue that the Cocas have flipped the position they adopted in pleadings filed in the Spanish foreclosure proceedings in which the Cocas alleged that Pelican was merely an agent for First City. This argument backfires, however, because First City in those same proceedings repeatedly insisted that Pelican was the Cocas' trustee, not First City's.[7]
 
 
 25
 The Coca family also highlights a draft version of a confidential resignation letter dated January 13, 1991 from Kevin Hart to First City chairman Robert Abboud. This draft strongly suggests that First City and its officers manipulated Pelican's relationship with the Cocas to benefit First City and its shareholders at the Cocas' expense. Hart wrote that First City had "inserted a Sole Administrator into the Cocas' relationship and willingly breached the fiduciary independence" supposedly guaranteed Pelican by the terms of various contracts.
 
 
 26
 This hodgepodge of facts and conflicting accounts represents a prime candidate for trial to lay the groundwork for the determination of Landan's possible fiduciary duty. See Fuqua v. Taylor, 683 S.W.2d 735, 737-38 (1984) (existence of facts giving rise to fiduciary duty are for fact finder); Thomas v. Chase Manhattan Bank, 1 F.3d 320, 328-29 (5th Cir.1993) (complex relationships ordinarily counsel against a determination that fiduciary duty did not arise as a matter of law).
 
 
 27
 In this unusual case, Landan's role, aptly described by the magistrate judge, was "chameleon-like" in capacities which "were as fluid as the Houston climate." Landan's counsel would have us believe that he was merely a typical attorney acting on behalf of his clients, First City and Pelican. Certain testimony and documentary evidence suggest, however, that Landan served as a de facto chief executive, soliciting buyers, negotiating deals with mortgaged and nonmortgaged property, and arranging for others to take over the administrative duties he was unable to perform himself. It is also apparent that Landan was closely tied to First City throughout the Coca deal: even the fees that the Cocas were obliged to pay Pelican were invoiced to the Cocas through KMC, Landan's law firm, with the explicit disclaimer that "the above referenced legal services are being performed on behalf of our client, First City, Texas--Houston N.A., and not on behalf of yourself, although they are being paid by you." Nevertheless, if Pelican was a fiduciary for the Cocas, Landan, as its agent, might also have become a fiduciary. We are not unmindful that imposing a fiduciary obligation on Landan would place him in the untenable position of owing fiduciary duties to all three parties in the loan transaction--First City, Pelican, and the Cocas. See Thigpen v. Locke, 363 S.W.2d 247 (Tex.1962) (rejecting finding of fiduciary duty in a debtor-creditor-case where the parties' interests were inherently at odds); Marriott Brothers v. Gage, 704 F.Supp. 731, 738 (N.D.Tex.1988) (entity cannot serve as fiduciary to opposing parties in a transaction), aff'd 911 F.2d 1105 (5th Cir.1990). But there is enough conflicting evidence, highlighted by Pelican's description as a fiduciary in the contract documents, that we believe the facts must be sorted out on a more complete record.
 
 
 28
 The Cocas' fourth theory is a narrower version of the above argument and is insufficient on its own to create liability. The Cocas contend that Pelican, Landan, and KMC incurred fiduciary duties and liability by acting as the agent or broker for the Coca properties because the contract between Pelican and the Cocas obliged Pelican to negotiate sales with potential purchasers, periodically charge the Cocas for advisory fees, and collect commissions on real estate assets sold. Unlike the typical broker-client relationship, however, Pelican was imposed on the Cocas by a party with antagonistic interests. The fact that First City selected Pelican to perform this role distinguishes the instant case from the cases cited by the appellants. See First City Mortgage Co. v. Gillis, 694 S.W.2d 144, 146 (Tex.App.--Houston [14th Dist.] 1985, writ ref'd n.r.e.) (finding fiduciary duties where client employed broker); Southern Cross Industries Inc. v. Martin, 604 S.W.2d 290, 292 (Tex.App.--San Antonio 1980, writ ref'd n.r.e.) (same); Wilson v. Donze, 692 S.W.2d 734, 739 (Tex.App.--Fort Worth 1985, no writ) (affirming creation of broker-client relationship despite no formal fee contract, when a licensed real estate broker engaged in blatant self-dealing by purchasing and reselling a married couple's twelve-acre farm which had been in the family for 80 years).[8] Thus, even though Pelican may have technically acted as the Cocas' broker, under the facts of this case that status alone did not result in a fiduciary relationship.
 
 
 29
 Finally, the Cocas argue that a fiduciary duty springs from appellees' counsel's statements at a hearing that Pelican's role was akin to a trustee under a deed of trust. It is clear, however, that a trustee does not owe a fiduciary duty to the mortgagor. First State Bank v. Keilman, 851 S.W.2d 914, 925 (Tex.App.--Austin 1993, writ denied); FDIC v. Myers, 955 F.2d 348, 350 (5th Cir.1992). From the foregoing discussion, it is apparent that only under two of the five theories espoused by the Cocas is there a genuine, material fact issue on whether Landan had duties to the Cocas that might rise to the extraordinary fiduciary level.
 
 
 30
 B. Did Landan Owe Contractual Duties?
 
 
 31
 The Cocas can only succeed on their contract claim if they can prove privity of contract between them and Landan or if they can establish that they were the intended third-party beneficiaries of contracts between a) First City and Landan or b) Pelican and Landan. It is undisputed that neither Landan nor his law firm were parties to any written agreements that the Cocas had with First City or Pelican. The Cocas repeat the facts and allegations on which they relied for their fiduciary duty argument to assert that an attorney-client relationship arose between Landan and the Cocas, thus creating contractual duties and privity. Having rejected this contention, we affirm the district court's finding that there was no privity of contract under which the Cocas can recover from Landan.
 
 
 32
 The Cocas also argue that Landan owed them duties as intended third-party beneficiaries under his contract with First City or Pelican to represent those parties' legal interests. The district court properly rejected this argument. A third-party beneficiary may not recover, under a theory of contractual liability, from an attorney based on that attorney's contract to provide legal services for another client. In other words, KMC and Landan owed contractual duties only to their clients, First City and Pelican. Copeland v. Tapp, Civ. Action No. H-89-0444 (S.D.Tex. Apr. 5, 1990), aff'd, 963 F.2d 369 (5th Cir.1992) (table reference); Marshall v. Quinn-L Equities, Inc., 704 F.Supp. 1384, 1395 (N.D.Tex.1988).
 
 C. Fraud and Civil Conspiracy
 
 33
 The district court dismissed the Cocas' claims for fraud and civil conspiracy to commit fraud for failure to plead them with particularity as required by Fed.R.Civ.P. 9(b). The district court found that the Cocas had made only conclusory allegations that Landan made undefined misrepresentations regarding "the benefits of the First City transaction" and "his role in all aspects of the transaction." Reviewing the pleadings de novo, we find that some of the Cocas' fraud claims meet the requirements of Rule 9(b): particularized allegations of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. Tel-Phonic Services, Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139 (5th Cir.1992).
 
 
 34
 Two allegations of fraud are particularly significant. The more important allegation is that Landan and Hart misrepresented during the 1989 credit negotiation the effect of Pelican's appointment as fiduciary. The complaint makes clear that these alleged misrepresentations involved the nature of the supposed "fiduciary" role that Pelican was to play, i.e., whether Pelican would owe fiduciary duties to the Coca family. The other significant allegation is that Landan directly and intimately structured and participated in transactions that materially benefitted First City and Pelican to the detriment of the Cocas and without revealing them to the family.[9] Taken in context with other allegations in their complaint, these allegations are sufficiently specific to survive dismissal under Rule 9(b).
 
 
 35
 Appellees contend that irrespective of Rule 9(b) compliance, the Cocas failed to offer competent evidence of fraud and civil conspiracy. We find, on the contrary, that the Cocas presented evidence sufficient to survive summary judgment on the two fraud claims just discussed and on the related civil conspiracy claim. As for the first claim, affidavit testimony from the Cocas, their English attorney, and Kevin Hart, if believed, indicates Landan represented that Pelican would be a fiduciary for the Cocas. Further evidence tending to raise a genuine issue are the documents themselves, drafted by Landan, which repeatedly refer to Pelican's "independent fiduciary" powers and which recite that the Cocas would "entrust" their properties to Pelican. Neither the parties nor the district court explored all the ramifications of this complex and novel fraud claim. We hold only that appellants' allegations on their face state a particularistic claim of fraudulent misrepresentation; we do not speculate on the numerous potential defenses available to appellees.
 
 
 36
 There is also sufficient evidence, primarily through affidavits, to withstand summary judgment on the second fraud claim discussed above: that Landan misrepresented, either affirmatively or by material omission, the circumstances and effect of transactions he structured regarding the Cocas' properties, especially in regard to the extent of First City's and Pelican's interest in these deals. Further, there is ample evidence that First City was intimately involved in nearly all of these alleged misdeeds, supporting the Cocas' claims of civil conspiracy to commit fraud.[10] For these reasons, we reverse the district court's summary judgment on some of the fraud claims and related civil conspiracy claims and remand them for further proceedings.
 
 D. Duress
 
 37
 The Cocas complained that Landan, together with Cihak, did not return specified documents to them prior to the signing of the loan/guarantee agreement. Specifically, they contend that days before the closing they requested that Landan return documents belonging to them so that they could pursue the possibility of closing with Manufacturers Hanover on better terms. After the Cocas insisted on their return, Cihak sent them a letter that threatened to assess them a $2 million fee as payment for First City's work in arranging the refinancing. The Cocas alleged that they could not come up with $2 million on such short notice and were forced to close with First City instead of Manufacturers Hanover under duress. The transaction was consummated on July 12, 1989; the Cocas filed their original complaint on March 31, 1992. The district court, citing Williams v. Khalaf, 802 S.W.2d 651 (Tex.1990), ruled that the plaintiffs' duress action was barred by a two-year statute of limitations in Texas.
 
 
 38
 No specific case or statute dictates whether the statute of limitations for duress is two or four years. Khalaf held that all fraud actions have a four-year limitations period, regardless of the remedy sought. 802 S.W.2d at 658. It also held, however, that "a tort not expressly covered by a limitations provision nor expressly held by this court to be governed by a different provision would presumptively be a 'trespass' for limitations purposes." Id. at 654 (emphasis added). Trespass actions have a two-year limitations period. Tex.Civ.Prac. & Rem.Code Ann. Sec. 16.003 (Vernon 1992). The appellants argue that duress is a species of fraud, citing lower court decisions. See, e.g., Stewart v. City of Austin, 744 S.W.2d 682, 683 (Tex.App.--Austin 1988, writ ref'd). Whether the duress claims are within the limitations period thus hinges on whether duress is a trespass (two years) or a fraud (four years).[11]
 
 
 39
 The cases cited by the Cocas characterizing duress as fraud were decided before the Texas Supreme Court clarified its position on these matters in Khalaf. That opinion traced the development of common law actions in trespass, " 'which involve[d] some violence--the violence [might] be exceedingly small,' " and actions in deceit, from which actions for fraud arose. 802 S.W.2d at 656 (citation omitted). The origins of fraud traced by Khalaf are in assumpsit, having as its roots actions on a promise leading to a claim for debt. Duress is inherently an action involving coercion and strong-arm tactics. See 41 Tex.Jur.3d, Fraud and Deceit Sec. 2 (1985) ("Fraud implies that a person's will was overcome by stealth or cunning, but duress implies a subversion openly and by means of force.") These characteristics easily relate to the common law roots of trespass which required some real or threatened violence. We therefore believe the Texas Supreme Court would classify duress as a trespass.
 
 
 40
 Additional support for this conclusion derives from the Court's interpretation of trespass in First National Bank of Eagle Pass v. Levine, 721 S.W.2d 287, 298 (Tex.1986), in which a trespass was defined as "an unlawful interference with one's person, property, or rights." The Levine court broadly construed a trespass to include a tortious interference with business relations. Id. A cause of action for duress is certainly within the ambit of a trespass thus defined. Following the presumption directed by Khalaf, it appears that Texas law imposes a two-year statute of limitations on duress claims. The district court properly dismissed these claims.
 
 E. KMC's Vicarious Liability
 
 41
 The Cocas allege that KMC, Landan's law firm, is jointly and severally liable for any liability found on Landan's part. In Texas, a law firm is liable to the same extent as any partner, who, acting in the ordinary course of the business of the partnership or with the authority of his partners, engaged in any wrongful act or omission and causes loss or injury to any person. Cook v. Brundidge Fountain Elliott & Churchill, 533 S.W.2d 751, 758 (Tex.1976). Whether Landan was acting in the ordinary course of business is a question of fact, dependent not only on Landan's actions and representations, but on the type of business that KMC ordinarily conducts. The district court noted that the allegations directed at Landan are based on Landan's activities separate and apart from his role as a lawyer. Under this reasoning, KMC would not be liable for Landan's "nonlawyer" acts. The Cocas note, however, that KMC billed the Cocas for Landan's activities, whether they were on behalf of First City or Pelican. They also note that he frequently used KMC letterhead for these activities. This evidence raises genuine issues of fact that compel further proceedings.
 
 F. Corporate Disregard
 
 42
 The Cocas assert that Landan and the law firm used Pelican as an alter ego of the firm, setting up Pelican as a sham to perpetrate a fraud. The Cocas allege this to pierce the corporate structure shielding agents of Pelican from liability. The district court granted summary judgment to Landan and KMC on these claims. The Cocas appeal only the dismissal of their "sham to perpetrate a fraud" claim. This claim does not focus on the subject corporation, i.e., Pelican, but upon some "inequitable result for the claimant because of something about the corporate form.... [T]he focus is on injustice or unfairness to the claimant caused by the corporation and its owners." Pan Eastern Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1133 (5th Cir.1988) (emphasis in original).
 
 
 43
 The district court properly granted summary judgment on this claim for an obvious reason. There is no ownership relation between or among KMC, Landan and Pelican; Pelican thus has no "corporate veil" between it and its lawyers and law firm. See Pan Eastern, supra. This claim is not just meritless, but silly.
 
 CONCLUSION
 
 44
 For the foregoing reasons, the summary judgment on certain of the appellants' fiduciary duty, fraud and civil conspiracy claims indicated herein is REVERSED and REMANDED for trial or further appropriate proceedings. This decision in no way intimates that Landan and KMC necessarily can or will ultimately be found liable. All other rulings of the district court on summary judgment are AFFIRMED.
 
 
 45
 AFFIRMED in part, REVERSED and REMANDED in part.
 
 
 
 *
 District Judge of the Northern District of Texas, sitting by designation
 
 
 [1]
 References to the Cocas or the Coca family herein usually encompass their closely related companies as well
 
 
 [2]
 The FDIC later declared First City insolvent in October 1992
 
 
 [3]
 The reason for these unusual arrangements is not clear. It may have been to comply with Spanish law, to reduce tax exposure, or simply to generate fees
 
 
 [4]
 Landan also signed on behalf of the actual mortgagee, First City Asset Servicing Company
 
 
 [5]
 The settlement appears to release the Cocas from their loan obligations in exchange for the Cocas' dropping their contract and tort claims against everyone but Landan and KMC
 
 
 [6]
 At some point, Pelican and its agents, i.e., Hart and Landan, began referring to Pelican in their correspondence as the "sole administrator" of the mortgaged Coca assets
 
 
 [7]
 "[T]he statement by the [Coca family] that it was First City who managed the real properties 'through a trustee' is totally false, since we insist, the administrator was a trustee of the owners-debtors, and not of First City." First City's Spanish pleadings, Rec. at 1515. First City went on to argue that "it is not admissible to act in a proceeding against one's own previous actions." Rec. at 1512
 
 
 [8]
 Our conclusion that the facts of this case did not create a broker-client relationship is supported by Janes v. CPR Corp., 623 S.W.2d 733 (Tex.App.--Houston [1st Dist.] 1981, writ ref'd n.r.e.), in which the court remarked:
 A real estate broker usually is understood to be one who is engaged by others on a commission basis to negotiate contracts relating to property. He is recognized as an agent employed to make or negotiate bargains or contracts for the sale or lease of real estate or other property between other persons to which he has paid a commission. The commission is usually paid by the seller and the broker generally is recognized as the latter's agent.
 
 
 [623]
 S.W.2d at 740 (emphasis added)
 
 
 [9]
 In the Cotehall deal, the Cocas allege that First City received a secret $1 million brokerage fee for introducing Pelican to the buyer of the properties. Landan allegedly drafted all of the necessary documents and then signed them on behalf of the Cocas, as well as on behalf of First City and the Pelican group, without the Cocas ever being told of First City's substantial benefit from the deal. The Cocas also allege that the planned sale and transfer of administrative duties to Mr. Freddi Sidi of Western Hemisphere Holdings constituted fraud on Landan's part. Pelican allegedly assured the family that Sidi had great experience in real estate operations and sales and that he had the financial capacity to purchase the contemplated properties. Landan again was purportedly intimately involved in this transaction, with complete authority being vested in him to act on behalf of Pelican. The Cocas claim that they were not told that Sidi was a friend of First City and Pelican who had neither the ability nor the financial capability to acquire the properties. These dealings with Mr. Sidi, which included a period where Sidi was given complete managerial control over the properties, allegedly resulted in gross mismanagement and severe devaluation of the Cocas' assets
 
 
 [10]
 There are several other allegations of fraud in the complaint. We agree with the district judge that some of these do not survive Rule 9(b) dismissal. These include the allegations of fraud connected with the Lundy transaction and undefined misrepresentations made by Landan regarding "the benefits of the First City transaction" and "his role in all aspects of the transaction." These allegations are too vague or too broad to satisfy Rule 9(b). Further, the claim that he withheld material information from the Cocas by not informing them that First City intended to detain their documents to prevent the Cocas from proceeding with the contemplated loan with Manufacturers Hanover is insufficient because it amounts to the time-barred duress claim in other garb. Allegations that Landan represented himself to others as the agent for the Coca family and their properties do not constitute fraud upon the Cocas. The remaining allegations of fraud are that Landan misrepresented to the Coca family that Mr. Hart was an officer of First City; that he misrepresented that the First City deal was superior to the one proposed by Manufacturers Hanover Bank; and finally, that Landan unbeknownst to the Cocas intentionally drafted the legal documents for the credit transaction to circumvent Spanish foreclosure proceedings, to improperly benefit First City, and to ensure that a promised side letter agreement relating to the deal would in reality be a promise "of no consequence." These three claims appear on their face to be rather weak. Although they are sufficiently specific to survive Rule 9(b), the parties have not clearly argued their evidentiary and legal merits. We therefore remand them to the district court to decide whether summary judgment is appropriate
 
 
 [11]
 The plaintiffs also alleged that they were subject to duress even if the two-year statute applies. These contentions lack merit. Assertions that Landan imposed his will on the Coca family through May 1990 are clearly insufficient to satisfy the requisites of duress